# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                CRIMINAL ACTION

VERSUS                                                No. 17-201

CHUKWUDI OFOMATA                             SECTION I

## ORDER & REASONS

Before the Court is defendant Chukwudi Ofomata's ("Ofomata") motion[1] to strike the death penalty as a possible punishment. The motion requests the following forms of relief: an order striking the government's notice of intent to seek the death penalty as to Ofomata; an order striking the notice of special findings in the superseding indictment;[2] an order requiring that the government produce the grand jury instructions that pertain to the consequences of the jury's special findings; and an order requiring the government to submit an outline with information about the evidence it intends to use to prove the aggravating factors set forth in its notice of intent to seek the death penalty as to Ofomata, followed by a hearing to determine the admissibility of such evidence.[3] For the following reasons, the motion is denied.

---

[1] R. Doc. No. 183.
[2] After Ofomata filed the present motion, the government filed a second superseding indictment.
[3] *Id.* at 2, 39.

# I.

On August 31, 2018, the government filed its notice of intent to seek the death penalty as to Ofomata.[4] Under the Federal Death Penalty Act (the "FDPA"), 18 U.S.C. §§ 3591–3598, "conviction of an offense punishable by death is followed by a separate sentencing hearing which involves both an eligibility and selection phase." *United States v. Ebron*, 683 F.3d 105, 149 (5th Cir. 2012). To render a defendant eligible for the death penalty, the government must prove beyond a reasonable doubt one of four mental states, also known as statutory intent factors, provided in § 3591(a)(2), and at least one of sixteen statutory aggravating factors provided in § 3592(c). *United States v. Bourgeois*, 423 F.3d 501, 506–07 (5th Cir. 2005).[5]

Once the defendant becomes eligible for the death penalty, the selection phase begins, during which the government may attempt to prove the existence of additional factors in support of its position that the death penalty should be imposed. *See* § 3593(c). Similarly, the defendant may attempt to prove the existence of mitigating factors to dissuade the sentencing jury from recommending a death sentence. *Id.* The jury then weighs the proven aggravating factors against any proven mitigating factors to determine if a death sentence is appropriate. § 3593(e).

---

[4] *See generally* R. Doc. No. 149.

[5] Additionally, the government must prove that the defendant was not younger than 18 years of age at the time of the offense. 18 U.S.C. § 3591(a).

## II.

Ofomata offers several arguments in support of his contention that the death penalty is unconstitutional, and he requests various forms of relief—all of which the Court will address in turn.

### A.

Ofomata first argues that over thirty years of experience with the federal death penalty has demonstrated that it operates in an arbitrary and capricious way, in violation of the Eighth Amendment.[6] In support of his position, Ofomata relies on a dissenting opinion from the United States Supreme Court's decision in *Glossip v. Gross*, in which two justices identified what they considered to be "fundamental constitutional defects" in the modern imposition of the federal death penalty. *Glossip*, 135 S. Ct. 2726, 2755–56 (Breyer, J. and Ginsburg, J., dissenting). He also relies on another federal district court's finding that the FDPA is imposed and carried out arbitrarily. *See United States v. Fell*, 224 F. Supp. 3d 327, 358 (D. Vt. 2016).

Notwithstanding the dissent in *Glossip* and the district court's findings in *Fell*, the majority of the Supreme Court has expressly provided that "it is settled that capital punishment is constitutional." *Glossip*, 135 S. Ct. at 2732. Indeed, in *Fell*, the district court ultimately concluded that—despite its finding that the death penalty is arbitrarily imposed—it was powerless: "Institutional authority to change this body of law is reserved to the Supreme Court." *Fell*, 224 F. Supp. 3d at 359.

---

[6] R. Doc. No. 183, at 3, 11.

Perhaps in an attempt to circumvent such precedent, Ofomata argues that, "if there has been a material change in facts relevant to the Eighth Amendment analysis," a district court may reconsider an issue that the Supreme Court has already decided.[7] The Court declines to do so. "Changing forty years of decisional law raises questions that can only be settled by the Supreme Court itself." *Id.* at 238–29; *see also United States v. Quinones*, 313 F.3d 49, 52 (2d Cir. 2002) (noting that, "to the extent the defendants' arguments rely upon the Eighth Amendment, their argument is foreclosed by the Supreme Court's decision in *Gregg v. Georgia*")[8]; *United States v. Jones*, 132 F.3d 132 F.3d 232, 242 (5th Cir. 1998) ("We are bound by Supreme Court precedent which forecloses any argument that the death penalty violates the Constitution under all circumstance.").

Moreover, Ofomata has not demonstrated any "material change" that is critical to the Eighth Amendment inquiry and which would warrant this Court's reconsideration of the issue. Ofomata first argues that the FDPA is extremely rare and infrequently imposed, citing *Furman v. Georgia*, 408 U.S. 238 (1972), which declared the death penalty cruel and unusual in violation of the Eighth and Fourteenth Amendments, as applied by the states at that time. But "[i]n the thirty-four years since *Furman* was decided, the [Supreme] Court has made clear that its decision was not based on the frequency with which the death penalty was sought or imposed." *United States v. Sampson*, 486 F.3d 13, 23 (1st Cir. 2007). "Rather, the

---

[7] *Id.* at 6.
[8] In *Gregg v. Georgia*, 428 U.S. 154, 195 (1976), the Supreme Court held that the death penalty is not *per se* unconstitutional.

primary emphasis . . . has been the requirement that the discretion exercised by juries be guided so as to limit the potential for arbitrariness." *Id.* Multiple circuits, including the Fifth Circuit, have held that "the FDPA fully meets the requirements of guided discretion." *See id.* at 24; *United States v. Mitchell*, 502 F.3d 931, 938 (9th Cir. 2007) ("That federal executions are rare . . . does not render the FDPA unconstitutional."); *Jones*, 132 F.3d at 241 ("The FDPA provides sufficient safeguards to prevent the arbitrary imposition of the death penalty.").

Ofomata's second argument in support of his request that the Court reevaluate the constitutionality of the death penalty under the Eighth Amendment is that the FDPA is discriminatory—namely, that there are racial and geographical disparities in the way the FDPA is utilized.[9] Ofomata relies on several studies and reports.[10] The Supreme Court, however, has rejected Eighth Amendment claims based on similar statistics:

> Because of the risk that the factor of race may enter the criminal justice process, we have engaged in "unceasing efforts" to eradicate racial prejudice from our criminal justice system. . . . Our efforts have been guided by our recognition that "the inestimable privilege of trial by jury . . . is a vital principle, underlying the whole administration of criminal justice[.]
>
> . . .
>
> At most, the . . . study indicates a discrepancy that appears to correlate with race. Apparent disparities in sentencing are an inevitable part of our criminal justice system. . . . "[T]here can be 'no perfect procedure for deciding in which cases governmental authority should be used to impose death.'" . . . Despite these imperfections, our consistent rule has been that constitutional guarantees are met when "the mode [for

---

[9] *Id.* at 8–11.
[10] *See id.*

determining guilt or punishment] itself has been surrounded with safeguards to make it as fair as possible." . . . Where the discretion that is fundamental to our criminal process is involved, we decline to assume that what is unexplained is invidious.

*McCleskey v. Kemp*, 481 U.S. 279, 309–13 (1987).

The Supreme Court in *McCleskey* refused to accept the results of the study proffered by the defendant as "the constitutional measure of an unacceptable risk of racial prejudice influencing capital decisions." *McCleskey*, 481 U.S. at 309. "The statistics submitted by [Ofomata] are no more probative than those rejected in *McCleskey*." *Sampson*, 486 F.3d at 26; *see also Fell*, 224 F. Supp. 3d at 357 ("The current state of the law . . . is that once the required statute is in place and the jury is made the decision-maker, the inquiry into factors such as racial bias, geographical disparity, and other shortcomings in jury decision-making is largely at an end.").

"In light of the safeguards designed to minimize racial bias in the process, the fundamental value of jury trial in our criminal justice system, and the benefits that discretion provides to criminal defendants," the data submitted by Ofomata "does not demonstrate a constitutionally significant risk of racial bias affecting the [FDPA's] capital sentencing process."[11] *McCleskey*, 481 U.S. at 313; *see also United States v. Sablan*, No. 00-531, 2006 WL 1028780, at *11 (D. Colo. Apr. 18, 2006) ("[B]y requiring juries to consider the individual characteristics of the defendant and specific

---

[11] Moreover, the FDPA provides that, when determining whether a death sentence is justified, the jury may not consider the race, color, or national origin of the victim. 18 U.S.C. § 3593(f). Nor may the jury recommend the death penalty unless it has concluded that it would recommend the death penalty for the instant crime regardless of the defendant's race, color, or national origin. *Id.*; *United States v. Webster*, 162 F.3d 308, 355 (5th Cir. 1998).

circumstances of the crime, and thereby narrowing the class of individuals subject to the death penalty, the FDPA in effect recognizes that 'a consistency produced by ignoring individual differences is a false consistency.'") (quoting *Eddings v. Okla.*, 455 U.S. 104, 112 (1982)); *Sampson*, 486 F.3d at 27 ("*McCleskey* prohibits us from assuming that 'what is unexplained is invidious.'") (citation omitted).

## B.

Ofomata also argues that the FDPA is unconstitutional because it fails to provide sentencing juries with a structure that permits them to make a reasoned choice between the death penalty and life imprisonment.[12]

To comply with federal constitutional requirements, a capital sentencing scheme must: "(1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *See Kansas v. Marsh*, 548 U.S. 163, 173–74 (2006). The FDPA satisfies the foregoing parameters. With respect to the narrowing requirement:

> [T]he FDPA requires the jury first to find that the defendant had the requisite intent. 18 U.S.C. § 3591. The FDPA further narrows the jury's discretion with the requirement [that] the jury find at least one statutory aggravating factor prior to recommending the death penalty. *See* 18 U.S.C. § 3592(c). Thus, the FDPA narrows the jury's discretion through the findings of intent and aggravating factors.

*Jones*, 132 F.3d at 248–49; *see also United States v. Aquart*, 912 F.3d 1, 100–03 (2d Cir. 2018) (holding that the FDPA's procedures "adequately channel the sentencer's discretion") (citations omitted); *United States v. Webster*, 162 F.3d 308, 355 (5th Cir.

---

[12] R. Doc. No. 183, at 11.

1998) (characterizing § 3591(a) as a "gatekeeping function"); *Sampson*, 486 F.3d at 24 ("[T]he FDPA fully meets the requirements of guided discretion, suitably directing and limiting the leeway afforded to the decisionmakers.").

Then, to ensure that sentencing is reasoned and individualized, "the jury decides whether the aggravating factors sufficiently outweigh statutory or non-statutory mitigating factors to warrant a death sentence or, absent mitigating factors, whether the aggravators alone warrant that sentence." *United States v. Davis*, 609 F.3d 663, 673 (5th Cir. 2010); *see also United States v. Davis*, No. 01-282, 2003 WL 1837701, at *12 (E.D. La. Apr. 9, 2003) (Vance, J.) ("Consideration of aggravating and mitigating factors is the means by which the jury takes into account both the circumstances of the crime and of the criminal before it recommends a sentence.").

Ofomata cites several studies, including one that this Court has already rejected as a source of relief, to argue that juries have great difficulty with the guided discretion process.[13] Regardless of the validity of these studies, the argument is foreclosed by precedent that is binding on this Court. *See Gregg*, 428 U.S. at 195; *United States v. Robinson*, 367 F.3d 278, 291 (5th Cir. 2004); *Jones*, 132 F.3d at 252–53; *see also Davis*, 2003 WL 1837701, at *12 (finding "that the studies cited by defendant are not sufficient to call into question the constitutionality of the FDPA's sentencing scheme" and "that a jury can be instructed so that it will understand and appropriately apply the FDPA's provisions").[14]

---

[13] *Id.* at 12–17.

[14] Ofomata cites a host of studies and articles—many from the 1990s—to demonstrate that jurors either misunderstand the capital sentencing process or misapply courts'

## C.

Ofomata also argues that the death penalty is contrary to evolving standards of decency in such a way that renders it unconstitutional.[15] As this Court has reiterated, it is bound by the decisions of higher courts. The Second Circuit summarized the significance of the Supreme Court's opinion in *Gregg v. Georgia* to modern death penalty challenges:

> [T]he Supreme Court expressly held in *Gregg v. Georgia* that capital punishment does not constitute a *per se* violation of the Eighth Amendment. . . . The Court reached this conclusion despite the petitioner's argument that the death penalty "entail[s] both mistake and caprice," and that "some people will be killed wrongly," Br. for Petitioner in *Gregg* at 10a, and despite its own acknowledgment that "[t]here is no question that death as a punishment is unique in its severity and

---

instructions. *See* R. Doc. No. 183, at 12–16. Other district courts have consistently rejected the same and similar studies. *See, e.g., United States v. Coonce*, No. 10-3029, 2014 WL 1018081, at *22 (W.D. Mo. Mar. 14, 2014) (holding that the studies submitted by the defendant "[fell] short of the mark in establishing that the FDPA is unconstitutional"); *United States v. Sanders*, No. 10-351, 2014 WL 3122418, at *7 (W.D. La. July 3, 2014) (rejecting the defendant's claim that the FDPA is unconstitutional because it is "incomprehensible"); *United States v. Green*, No. 06-19, 2008 WL 4000901, at *1–2 (W.D. Ky. Aug. 28, 2008) (holding that "the findings of the [Capital Jury Project] provide no basis for undermining the constitutionality of the FDPA, a statute that has withstood innumerable attacks since its passage in 1994"); *United States v. Duncan*, No. 07-23, 2008 WL 544847, at *1 (D. Idaho Feb. 26, 2008) ("Similar arguments that the findings of certain death penalty studies justify invalidating capital statutes have been rejected by other courts."); *United States v. Sablan*, No. 00-531, 2006 WL 1028780, at *7–8 (D. Colo. Apr. 18, 2006) (adopting the reasoning of other courts and rejecting the argument that the FDPA's sentencing scheme is too confusing to juries); *United States v. Mikos*, No. 02-137, 2003 WL 22110948, at *17 (N.D. Ill. Sept. 11, 2003) ("There is no justification prior to trial for this court to hold that the sentencing jury will be unable to comprehend the provisions of the FDPA or the instructions provided by court or counsel. "); *United States v. Llera Plaza*, 179 F. Supp. 2d 444, 450 n.5 (E.D. Pa. 2001) ("[T]he studies do not establish that the concepts of aggravating and mitigating factors as used in the FDPA bear such a degree of intrinsic 'incomprehensibility' as to render them incapable of clarification through adequate jury instructions . . . .").

[15] R. Doc. No. 183, at 17.

> irrevocability.". . . The *Gregg* Court was . . . keenly aware of the argument asserted here, that execution terminates any asserted right to the opportunity for exoneration during one's natural life. Despite this awareness, the Court rejected the proposition that capital punishment is unconstitutional *per se*.

*Quinones*, 313 F.3d at 67; *see also Baze v. Rees*, 553 U.S. 35, 61 (2008) ("This Court has ruled that capital punishment is not prohibited under our Constitution . . . ."). Indeed, "the Supreme Court expressly held in *Gregg* that, to the extent our standards of decency have evolved since the enactment of the Constitution, they still permit punishment by death for certain heinous crimes." *Quinones*, 313 F.3d at 61.

In light of *Gregg*, the Fifth Circuit has similarly held that the death penalty is not *per se* unconstitutional. *Jones*, 132 F.3d at 242 ("We are bound by Supreme Court precedent which forecloses any argument that the death penalty violates the Constitution under all circumstance[s].").

> [The defendant] asks us to invalidate the FDPA on the ground that the death penalty is cruel and unusual punishment, in violation of the Eighth Amendment. He recognizes that this claim is foreclosed *by Gregg v. Georgia*, . . . but he argues that societal standards of decency have evolved to the point at which imposing the death penalty against an adult murderer has become an intolerably cruel act. . . . We note, however, that it is uncertain whether this court is even empowered to recognize such an evolution in the law, or must instead reserve that question for the Supreme Court. Even assuming we had such a power, Robinson presents no evidence of an evolution in societal standards of decency, and we see no reason to believe that there has emerged a national consensus against capital punishment for defendants who commit crimes that are as depraved as [the defendant's].

*Robinson*, 367 F.3d at 291. Absent the Supreme Court announcing a change in the law, the Court cannot declare the FDPA unconstitutional based on Ofomata's broad arguments that the death penalty is contrary to changed societal standards.[16]

### D.

Ofomata next argues that the FDPA creates an unacceptable risk of executing the innocent. The Court notes that, although Ofomata frames this argument as a direct challenge to the FDPA, most of the studies, articles, and cases he cites discuss the death penalty generally.

The terrible possibility that innocent people may be executed under a capital sentencing scheme is not new, and it has been contemplated by both Congress and the Supreme Court. *See Quinones*, 313 F.3d at 63.

> [I]t has been central to the centuries-old debate over both the wisdom and the constitutionality of capital punishment, and binding precedents of the Supreme Court prevent us from finding capital punishment unconstitutional based solely on a statistical or theoretical possibility that a defendant might be innocent.
>
> . . .
>
> [T]he Supreme Court has upheld state and federal statutes providing for capital punishment for over two hundred years, and it has done so despite a clear recognition of the possibility that, because our judicial system—indeed, any judicial system—is fallible, innocent people might be executed and, therefore, lose any opportunity for exoneration.

*Id.* at 63, 64 (citing *Furman v. Georgia*, *Gregg v. Georgia*, and *Herrera v. Collins*, 506 U.S. 390 (1993)). In addition to the Second Circuit in *Quinones*, other courts have held that "the mere possibility that an actually innocent person may be [executed]

---

[16] *Id.* at 24.

cannot be the . . . touchstone" for declaring the FDPA unconstitutional. *United States v. Montgomery*, No. 05-6002, 2007 WL 1031282, at *7 (W.D. Mo. Apr. 2, 2007); *see also Sampson*, 486 F.3d at 27–28; *United States v. Sanders*, No. 10-351, 2014 WL 3122418, at *7 (W.D. La. July 3, 2014); *United States v. Sablan*, No. 00-531, 2006 WL 1028780, at *13 (D. Colo. Apr. 18, 2006); *United States v. Mikos*, No. 02-137, 2003 WL 22110948, at *14 (N.D. Ill. Sept. 11, 2003); *United States v. Church*, 217 F. Supp. 2d 700, 702 (W.D. Va. 2002); *Davis*, 2003 WL 1837701, at *11–12.

### E.

Ofomata argues that the Supreme Court's opinion in *Ring v. Arizona*, 536 U.S. 584 (2002), rendered the FDPA unconstitutional.[17] In *Apprendi v. New Jersey*, the Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum" is the "functional equivalent of an element of a greater offense" that "must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. 466, 490, 494 n.19 (2000). Two years later, in *Ring*, the Supreme Court applied *Apprendi* to capital cases, reiterating *Apprendi*'s holding that if Congress, in the case of the FDPA, "makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how [Congress] labels it—must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602. Through a series of at times confusing "principles," Ofomata argues that the FDPA is inconsistent with *Ring*'s conclusion that aggravating factors essential to

---

[17] R. Doc. No. 183, at 28.

determining a defendant's eligibility for the death penalty are "elements" of a capital offense.[18]

The Fifth Circuit has held that "*Ring* . . . applies with equal force in the context of a Fifth Amendment Indictment Clause challenge." *Robinson*, 367 F.3d at 284. Consequently, "the government is required to charge, by indictment, the statutory aggravating factors it intends to prove to render a defendant eligible for the death penalty." *Id.*

Ofomata argues that the FDPA is unconstitutional under *Ring* because it does *not* provide for the presentation of aggravating factors to a grand jury via an indictment but, rather, "vests authority to identify the aggravating factors exclusively with the prosecutor."[19] He argues that the government's presentation of aggravating factors to a grand jury is therefore "contrary to the unambiguous intent of Congress as expressed in the FDPA."[20] However, the Fifth Circuit has expressly held that the FDPA's failure to require that eligibility factors be charged in an indictment does not render it unconstitutional. *Id.* at 290. *Robinson* would, therefore, seem to foreclose Ofomata's argument.[21]

Recognizing as much, Ofomata attempts to distinguish his argument from those arguments previously considered by the Fifth Circuit. He relies primarily on

---

[18] *Id.* at 30–31.
[19] *Id.* at 30.
[20] *Id.*
[21] The second superseding indictment complies with constitutional requirements: the statutory aggravating factors listed in the government's notice of intent to seek the death penalty as to Ofomata were all charged in the indictment.

the Supreme Court's opinion in *United States v. Jackson*, 390 U.S. 570, 585 (1968), which held the death penalty clause of the Federal Kidnaping Act unconstitutional. According to Ofomata, *Jackson* stands for the proposition that "it is for the legislature, not the courts or the prosecutor, to define crimes and punishment and the contours of a statute."[22] He argues that the FDPA cannot be "amended" by this Court to require the presentation of aggravating factors to a grand jury: only Congress can make such a change.[23] Preemptively, he also asserts that those circuit courts that have upheld the FDPA under *Ring* either failed to address *Jackson* or failed to acknowledge the FDPA's express allocation of authority to the prosecutor to determine "the propriety of aggravating factors."[24]  This argument is unavailing.

First, the Court rejects Ofomata's contention that the Fifth Circuit was simply unaware of *Jackson* and other Supreme Court cases discussing statutory construction when *Robinson* was decided. The Fifth Circuit acknowledged that the language of the FDPA does not require prosecutors to charge aggravating factors by indictment. *Robinson*, 367 F.3d at 290. However, the FDPA's failure to do so makes sense in light of the state of the law at the time the FDPA was enacted:

> The FDPA makes no mention of the grand jury. This omission is understandable. Congress enacted the FDPA in 1994 against the backdrop of *Walton v. Arizona*, 497 U.S. 639 . . . (1990), in which the Supreme Court held that "the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury." *Id.* at 648 . . . . Essentially, the *Walton* Court held that the facts necessary to render a defendant eligible for the death penalty were not elements of the offense itself, making inapplicable the

---

[22] R. Doc. No. 183, at 30.
[23] *Id.*
[24] *Id.* at 31.

Fifth Amendment requirement that the elements of an offense be charged by a grand jury in an indictment.

*Sampson*, 486 F.3d at 20. In 2002—after the FDPA was enacted—*Ring* overruled *Walton*. *Ring*, 536 U.S. at 609.

The Fifth Circuit has nonetheless upheld the FDPA, explaining that "nothing in [the] law inhibit[s]" charging eligibility factors by indictment. *Robinson*, 367 F.3d at 290. Indeed, "[t]he government can easily comply with its constitutional obligations (by first going to the grand jury) and its statutory obligations (by later filing a § 3593(a) notice of intention to seek the death penalty)." *Id.* The Fifth Circuit recognized that the FDPA need not expressly require the government to charge eligibility factors by indictment: the government is already required to do so in accordance with the Fifth Amendment. *Id.*; *see also United States v. Bourgeois*, 423 F.3d 501, 502 (5th Cir. 2005).

Other circuit courts have also rejected Ofomata's argument. *See United States v. Brown*, 441 F.3d 1330, 1367 (11th Cir. 2006), *cert. denied*, 549 U.S. 1182 (2007); *United States v. Allen*, 406 F.3d 940, 949 (8th Cir. 2005), *cert. denied*, 549 U.S. 1095

(2006); *Sampson*, 486 F.3d at 21.[25] As these courts have stressed, there is nothing unconstitutional about the FDPA in light of *Ring*.[26]

## F.

Ofomata also argues that the Supreme Court's decision in *Hurst v. Florida*, 136 S. Ct. 616 (2016), requires re-evaluation of the significance of *Apprendi* in FDPA cases.[27] In *Hurst*, the Supreme Court struck down Florida's capital sentencing scheme as unconstitutional. *Id.* at 619. The law employed a "hybrid" proceeding: first, after an evidentiary hearing, the jury would render an advisory verdict of either death or life imprisonment—without specifying the basis of its recommendation. *Id.* at 620. Then, after weighing the aggravating and mitigating circumstances, the court would determine which sentence was appropriate, albeit giving "great weight" to the jury's recommendation. *Id.* The Supreme Court held that, because Florida's capital-

[25] The Court disagrees with Ofomata's characterization of his argument as novel. Most of the circuit courts that have rejected the idea that the FDPA conflicts with *Ring* explicitly addressed arguments akin to Ofomata's. *See*, *e.g.*, *Brown*, 441 F.3d at 1367 ("Brown argues that the grand jury cannot 'fix' the defect in the statute by simply alleging the aggravating factors in the indictment; according to Brown, only Congress can cure the deficiency in the law."); *Sampson*, 486 F.3d at 21 ("Sampson contends both that there is a conflict between the FDPA and *Ring,* and that curing the problem would require the rewriting of the statute, which is a legislative function.").

[26] Related to this argument, Ofomata also requests that the Court order the government to provide a copy of the instructions given to the grand jury "to determine whether the [United States Department of Justice's] post-*Ring* policy is more than window dressing, and to ensure that the grand jury was aware of the impact of the inclusion of 'special findings' in the indictment." R. Doc. No. 183, at 29. The Court declines to do so. In a previous order, this Court joined numerous other courts in rejecting the argument that a grand jury must be made aware of the penalty-related consequences of its findings. *See* R. Doc. No. 195, at 12–13.

[27] R. Doc. No. 183, at 31.

sentencing scheme required the judge, rather than the jury, to make the "critical findings necessary to impose the death penalty," the scheme violated the Sixth Amendment in light of *Ring*:

> Florida concedes that *Ring* required a jury to find every fact necessary to render Hurst eligible for the death penalty. But Florida argues that when Hurst's sentencing jury recommended a death sentence, it "necessarily included a finding of an aggravating circumstance." Brief for Respondent 44. The State contends that this finding qualified Hurst for the death penalty under Florida law, thus satisfying *Ring*.
>
> . . .
>
> The State fails to appreciate the central and singular role the judge plays under Florida law. . . . [T]he Florida sentencing statute does not make a defendant eligible for death until "findings by the court that such person shall be punished by death." Fla. Stat. § 775.082(1) (emphasis added). The trial court *alone* must find "the facts . . . [t]hat sufficient aggravating circumstances exist" and "[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances." § 921.141(3) . . . . "[T]he jury's function under the Florida death penalty statute is advisory only." . . . The State cannot now treat the advisory recommendation by the jury as the necessary factual finding that *Ring* requires.

*Id.* at 622 (citations omitted).

Ofomata argues that, under *Hurst*, the weighing process mandated by the FDPA is a "fact" that must be found by a jury beyond a reasonable doubt.[28] From this conclusion, he extrapolates that non-statutory aggravating factors, which are considered during the weighing process, must also be found by a jury beyond a reasonable doubt and, hence, charged by indictment and presented to a grand jury.[29]

---

[28] *Id.* at 33.
[29] *Id.*

Effectively, Ofomata argues that *Hurst* makes non-statutory aggravating factors functionally equivalent to elements of a capital crime under *Apprendi* and *Ring*.

As Ofomata admits, numerous circuit courts, including the Fifth Circuit, have held that non-statutory aggravating factors need not be charged by indictment. *United States v. LeCroy*, 441 F.3d 914, 922 (11th Cir. 2006); *United States v. Higgs*, 353 F.3d 281, 299 (4th Cir. 2003); *Bourgeois*, 423 F.3d at 507–08. Such a requirement is constitutionally unnecessary because non-statutory aggravating factors are *not* functionally equivalent to elements of a capital crime. As previously explained, to render a defendant eligible for the death penalty under the FDPA, the government must prove beyond a reasonable doubt one statutory intent factor and at least one statutory aggravating factor. *Bourgeois*, 423 F.3d at 506–07. These eligibility factors are functionally "elements" of a capital crime. *See United States v. Cheever*, 423 F. Supp. 2d 1181, 1207–08 (D. Kan. 2006) ("[E]ven accepting for sake of argument defendant's conclusion that *Ring* created a new offense of federal capital murder . . . , the 'elements' of such a crime would at most include one of the gateway intent factors and one statutory aggravating factor.").

By contrast, although non-statutory aggravating factors may increase the possibility that the jury recommends the death penalty, they are only presented to the jury during the weighing process—after the defendant has been found eligible for the death penalty: they "are neither sufficient nor necessary under the FDPA for a sentence of death." *United States v. Purkey*, 428 F.3d 738, 749 (8th Cir. 2005); *see also Cheever*, 423 F. Supp. 2d at 1207–08 (explaining that, after the jury finds the

existence of a statutory intent and statutory aggravating factor, "a defendant is eligible for the death penalty, and the penalty that he faces cannot be increased any further"). Indeed, once the jury begins the weighing process, it "is not acting as a finder of fact"; rather, "it is exercising discretion in sentencing that is ordinarily exercised by judges." *United States v. Sampson*, 335 F. Supp. 2d 166, 238 (D. Mass. 2004). And as the government notes, this discretion is outside the reach of *Apprendi*.[30] *See Apprendi*, 530 U.S. at 481 ("We should be clear that nothing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment within the range prescribed by statute.").

Ofomata nonetheless urges this Court to reconsider circuit precedent in light of *Hurst*. The Court has already noted that nothing in *Hurst* indicates that the Supreme Court intended to alter the law as it is set forth in *Apprendi* and *Ring*.[31] *See Ybarra v. Filson*, 869 F.3d 1016, 1030–31 (9th Cir. 2017) (expressing extreme skepticism at the defendant's argument that, under *Hurst*, the weighing process in Nevada's capital sentencing scheme is like an element of a capital offense). The Supreme Court held Florida's capital statute unconstitutional because the jury's verdict was advisory. The court's role was simply too powerful. *See Lambrix v. Secretary, DOC*, 872 F.3d 1170, 1174 (11th Cir. 2017) (summarizing *Hurst* as holding that Florida's scheme violated the Sixth Amendment "because it required the judge

---

[30] R. Doc. No. 225, at 27.
[31] R. Doc. No. 236, at 8–9 n.15.

alone to find the existence of an aggravating circumstance necessary for the imposition of a death sentence"). By contrast, the FDPA adheres to the Constitution by requiring that a jury (1) find beyond a reasonable doubt the factors that render a defendant eligible for the death penalty and (2) make the ultimate sentencing recommendation. *See* 18 U.S.C. §§ 3591(a), 3593(c) and (d), 3594.[32]

## G.

Ofomata next argues that the process of selecting a "death-qualified" jury violates both his rights and the rights of prospective jurors.[33] The Sixth Amendment grants a defendant the right "to have his guilt or innocence determined by an impartial jury selected from a representative cross-section of the community." *Lockhart v. McCree*, 476 U.S. 162, 167 (1986). In *Witherspoon v. State of Illinois*, 391 U.S. 510, 514 (1968), the Supreme Court made clear that the government may exclude from a jury those veniremen who make clear that they would *never* vote to

---

[32] Other courts have rejected Ofomata's argument. *See Underwood v. Royal*, 894 F.3d 1154, 1186 (10th Cir. 2018), *petition for cert. filed* (U.S. Jan. 16, 2019) (No. 18-7442), (noting that "*Hurst* did not directly address *Apprendi*'s application to the weighing of aggravating and mitigating circumstances"); *United States v. Con-ui*, No. 13-123, 2017 WL 1393485, at *2, 6 (M.D. Pa. Apr. 18, 2017) (noting that "*Hurst* merely applied *Ring*'s holding to Florida's capital sentencing procedure"; it "did not expand the ruling in *Ring* and *Apprendi* to transform the 'complex moral judgment' involved in selecting the appropriate punishment into an 'element' of the underlying capital offense"); *United States v. Roof*, 225 F. Supp. 3d 413, 419 (D.S.C. 2016) (rejecting the argument that *Hurst* requires courts to revisit precedential cases, explaining that "*Hurst* held that any aggravating factor that exposes a defendant to greater punishment than the punishment authorized by the jury's guilty verdict must be submitted to a jury" and that, because "aggravating factors that expose [the defendant] to the death penalty will be established by a jury" in accordance with the FDPA, "any *Hurst* issue" is avoided); *see also Sampson*, 486 F.3d at 32 ("[T]he requisite weighing constitutes a process, not a fact to be found.").

[33] R. Doc. No, 183, at 19.

impose the death penalty.[34] Notably, the government cannot exclude "veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* at 514.

Ofomata concedes that the Supreme Court has held that a death-qualified jury does not violate the Sixth Amendment.[35] He argues, however, that the case law is outdated—that recent studies show that the process of death-qualification results in juries that are more likely to be white, older, male, Protestant, and less educated than other criminal juries and that, consequently, the selection of a death-qualified jury does in fact result in juries that are not drawn from a fair cross-section of communities.[36] Yet, the Fifth Circuit has recently considered this issue. In 2013, *after* all but one of the articles that Ofomata cites were published, the Fifth Circuit reiterated the "well-established rule[ ] of law" that "death-qualified juries do not violate the fair cross-section requirement." *United States v. Simpson*, 645 F.3d 300, 313 (5th Cir. 2011). Ofomata's argument is, therefore, foreclosed. *See also id.* at 312 n.10 (noting that, even if a disproportionate number of minorities and women are

---

[34] Specifically, the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon*, 391 U.S. at 522. However, the Supreme Court has also held that a juror should be excluded if his views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. 38, 45 (1980).

[35] R. Doc. No. 183, at 20.

[36] *Id.* at 19–20 (quoting Richard Salgado, *Tribunals Organized to Convict: Searching for a Lesser Evil in the Capital Juror Death-Qualification Process in* United States v. Green, 2005 B.Y.U. L. Rev. 519 (2005)).

removed during the death-qualification process, Supreme Court precedent dictates that "the fair cross section requirement is not violated when jurors are removed because of their death penalty views, regardless of their ethnicity or gender").

Ofomata also argues that the process of selecting a death-qualified jury results in juries that favor the prosecution.[37] This assertion, without more, does not establish a legal basis for holding the death penalty unconstitutional. And to the extent that the argument is grounded in the theory that death-qualified juries exclude people with a wide range of values, the argument is precluded by the aforementioned Sixth Amendment cases. *See also Buchanan v. Kentucky*, 483 U.S. 402, 415 & n.16, 416 (1987) (assuming *arguendo* the validity of studies suggesting that death-qualified juries are more conviction-prone and nonetheless rejecting the defendant's argument that a death-qualified jury lacks impartiality). Moreover,

> [i]f we momentarily assume that jurors who favor the death penalty are, by nature, more favorable to the government, it seems to us that logical consistency would require us further to assume that jurors who oppose the death penalty may be more favorable to the defense. Faced with this assumed dichotomy, when the respective challenges are granted, we are left with a middle class of jurors, who are supposedly impartial and fair.

*Simpson*, 645 F.3d at 313.

Finally, Ofomata argues that the death-qualification process necessarily excludes jurors based on their religion in violation of their rights under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* ("RFRA"), and the First Amendment.[38] The Court will address these arguments separately.

---

[37] R. Doc. No. 183, at 21.
[38] *Id.* at 23.

**i.**

RFRA provides that the "[g]overnment shall not burden a person's exercise of religion even if the burden results from a rule of general applicability." § 2000bb-1(a). "To claim RFRA's protections, a person 'must show that (1) the relevant religious exercise is grounded in a sincerely held religious belief and (2) the government's action or policy substantially burdens that exercise by, for example, forcing the plaintiff to engage in conduct that seriously violates his or her religious beliefs.'" *United States v. Comrie*, 842 F.3d 348, 351 (5th Cir. 2016) (quoting *Ali v. Stephens*, 822 F.3d 776, 782–83 (5th Cir. 2016)) (internal quotations omitted). The law was designed to provide greater protection for religious exercise than that afforded by the First Amendment. *Id.*

RFRA includes an exception, however: the "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling interest." § 2000bb-1(b). However, "[o]nly 'if the [religious person] carries [his or her] burden' does the government 'bear[ ] the burden of proof to show that its action or policy'" meets the exception. *See id.* (quoting *Ali*, 822 F.3d at 783).

As an initial matter, Ofomata has not met his burden of demonstrating that the process of selecting a death-qualified jury substantially burdens the free exercise

of religion.[39] Ofomata's conclusory argument is that jurors' views on the death penalty often "reflect[ ] [their] religious convictions" and that "[e]xcluding someone from a capital jury based on his or her religious beliefs violates . . . RFRA."[40]

The death-qualification process "focuses on whether the jurors' views would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and oath." *Thompson v. Premo*, No. 15-1313, 2018 WL 472445, at *5 (D. Or. Jan. 16, 2018). Indeed, the Fifth Circuit has held that "a veniremember may not be excluded from sitting on a capital jury simply because she . . . expresses conscientious or religious scruples against its infliction." *Ortiz v.*

---

[39] RFRA does not define what it means for government action to substantially burden a person's religious exercise. Nor has the Fifth Circuit offered a singular definition. In *Hicks v. Garner*, 69 F.3d 22 (5th Cir. 1995), the Fifth Circuit noted that "a 'substantial burden' has been defined in several different ways," including "preventing [a person] from engaging in conduct or having a religious experience which the faith mandates" beyond "an inconvenience"; "significant[ly] inhibit[ing] or constrain[ing] conduct or expression that manifests some central tenet of a [person's] individual beliefs"; and "compel[ling] a person to do something in contravention of their religious beliefs or requir[ing] them to refrain from doing something required by their religious beliefs." *Hicks*, 69 F.3d at 23 n.22 (quoting *Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir. 1995), *Werner v. McCotter*, 49 F.3d 1476, 1480 (10th Cir. 1995), and *In re Newman*, 183 B.R. 239, 251 (Bankr. D. Kan. 1995)).

Since *Hicks*, no one definition has prevailed. *See, e.g., Whole Women's Health v. Smith*, 896 F.3d 362, 371 (5th Cir. 2018) (holding that compelling an ecclesiastical association to reveal internal communications regarding its view on the treatment of fetal remains via subpoena and subjecting the association to sanctions constituted a substantial burden); *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 472 (5th Cir. 2014) (holding that a federal law prohibiting the possession of certain eagle feathers substantially burdened the exercise of the Native American plaintiff's religious beliefs); *Tagore v. United States*, 735 F.3d 324, 330 (5th Cir. 2013) (holding that an IRS agent who risked violating federal law and eventually gave up her job so that she could wear a dagger as part of a religious ceremony had her religious practice substantially burdened).

[40] R. Doc. No. 183, at 24.

*Quarterman*, 504 F.3d 492, 500 (5th Cir. 2007), *cert. denied*, 553 U.S. 1035 (2008). "[J]urors are not excluded simply because they are opposed to the death penalty on religious grounds, but only if they are unable to set those views aside and apply the law impartially." *United States v. Mitchell*, 502 F.3d 931, 954 (9th Cir. 2007).

Even assuming that Ofomata was able to show that the death-qualification process constitutes a substantial burden, his RFRA claim fails because "[t]he question [of] whether a juror is able to follow the law and apply the facts in an impartial way . . . *is* a compelling government interest." *Id.* at 954 (rejecting the assertion that excluding jurors because of their religion and corresponding views on the death penalty violated RFRA); *see also Lockhart v. McCree*, 476 U.S. 162, 175–76 (1986) ("'Death qualification,' unlike the wholesale exclusion of blacks, women, or Mexican-Americans from jury service, is carefully designed to serve the [the government's] concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial."). "And the rule excluding jurors who are unable to do so is the least restrictive means to achieve that end[.]" *Mitchell*, 502 F.3d at 954.

### ii.

Ofomata's First Amendment claim under the Free Exercise Clause fails for substantially the same reasons. The Free Exercise Clause provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. Unlike claims evaluated under RFRA, "a neutral, generally applicable governmental regulation will withstand a free exercise

challenge when the regulation is reasonably related to a legitimate state interest." *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 292 (5th Cir. 2001) (citing *Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 879 (1990)); *see also Cornerstone Christian Sch. v. University Interscholastic League*, 563 F.3d 127, 135 (5th Cir. 2009) ("The government does not impermissibly regulate religious belief, however, when it promulgates a neutral, generally applicable law or rule that happens to result in an incidental burden on the free exercise of a particular religious practice or belief.").

As the Court has already explained, the death-qualification process does not exclude jurors based on their religious beliefs. Instead, the process ensures that jurors' views on the death penalty do not preclude them from performing their duties in accordance with their oath and a court's instructions. *Cf. Lockhart*, 476 U.S. at 176 ("[N]ot all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law."); *Cain v. Woodford*, No. 96-2584, 2003 WL 27376296, at *24 (C.D. Cal. June 12, 2003) ("[A] juror excluded not merely because of his religious beliefs, but because he indicates that he would not be willing to subordinate his personal views, has not been categorized according to his religion.").

The Supreme Court has expressly held that "a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror

and must be removed for cause." *Morgan v. Illinois*, 504 U.S. 719, 728 (1992).

Accordingly, courts have rejected Ofomata's argument. *See United States v. Casey*,

No. 05-277, 2013 WL 12190565, at *2 (D.P.R. Jan. 23, 2013) (noting that Supreme

Court standards "base[ ] for-cause removal upon ethical or moral principles which do

not necessarily stem from any religious affiliation or belief"); *Roof*, 225 F. Supp. 3d at

416 ("The 'death qualification' process eliminates from the prospective jury pool only

those persons who state that they are unable to render a verdict based on the evidence

presented during trial and the Court's instructions on the law" and "does not require

the Court or the parties to look to the sources of an excluded juror's beliefs."");

*Thompson*, 2018 WL 472445, at *5 (rejecting the defendant's argument that death-

qualification violated jurors' rights to the free exercise of their religion).[41]

---

[41] Ofomata also argues that the process of selecting a death-qualified jury violates the First Amendment's Establishment Clause. R. Doc. No. 183, at 23. However, the issue was not properly briefed. As the Fifth Circuit has explained, "[t]he Supreme Court generally applies at least one of three tests under the Establishment Clause: the *Lemon* test, the endorsement test, and the coercion test." *American Humanist Ass'n v. McCarty*, 851 F.3d 521, 525 (5th Cir. 2017). Under the first test, "a statute violates the Establishment Clause if (1) it does not have a secular purpose, (2) its principal or primary effect advances or inhibits religion, or (3) it creates excessive government entanglement with religion." *Croft v. Perry*, 624 F.3d 157, 166 (5th Cir. 2010) (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971)). Under the second test, the "[g]overnment unconstitutionally endorses religion whenever it appears to take a position on questions of religious belief, or makes adherence to a religion relevant in any way to a person's standing in the political community." *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996). Finally, under the third test, "unconstitutional coercion occurs where '(1) the government directs (2) a formal religious exercise (3) in such a way as to oblige the participation of objectors.'" *McCarty*, 851 F.3d at 525 n.12 (citation omitted). Despite the fact that the Establishment Clause jurisprudence is "rife with confusion," *Freiler v. Tangipahoa Parish Sch. Bd. of Educ.*, 185 F.3d 337, 343 (5th Cir. 1999), Ofomata has not even attempted to argue that the death-qualification process fails any of the foregoing

## H.

Finally, Ofomata requests that the Court order the government to submit a detailed outline of the evidence it intends to use at the sentencing hearing to prove the aggravating factors set forth in the notice of intent.[42] In a previous order denying a request for the same relief filed by one of Ofomata's co-defendants, the Court held that the government's notice of intent as to that defendant met the statutory and constitutional requirements.[43] For the reasons stated therein, the Court concludes the same here: the government's notice of intent as to Ofomata complies with both the FDPA and the Fifth Amendment, and the government need not supplement the notice of intent with an outline or additional information.[44]

---

tests—or any other Establishment Clause standard—and the Court deems the argument waived.

[42] R. Doc. No, 183, at 35.

[43] *See* R. Doc. No. 195, at 17–20.

[44] Ofomata also moves the Court to schedule a hearing on the admissibility of the evidence to be presented at the sentencing hearing. R. Doc. No. 183, at 35. The Court declines to do so at this time.

## III.

Accordingly,

**IT IS ORDERED** that the motion to declare the death penalty and the Federal Death Penalty Act unconstitutional, including the other forms of relief requested therein, is **DENIED.**[45]

New Orleans, Louisiana, February 11, 2019.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[45] Ofomata's final request is that the record from *United States v. Fell*, 224 F. Supp. 3d 327 (D. Vt. 2016), be incorporated into the record. R. Doc. No. 183, at 6, 39. However, because Ofomata attached the *Fell* record to his motion as an exhibit, it is already part of the record in this matter.