## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **No. 17-201** |
| **LILBEAR GEORGE,** | |
| **CURTIS JOHNSON, JR.,** | **SECTION I** |
| **& CHUKWUDI OFOMATA** | |

## ORDER AND REASONS

Before the Court is a motion[1] filed by defendants Lilbear George ("George"), Chukwudi Ofomata ("Ofomata"), and Curtis Johnson, Jr. ("Johnson") (collectively, "defendants") to exclude Robert Donnell ("Donnell"), a witness, from testifying at trial "due to the loss, destruction, and spoliation of potentially exculpatory death-case evidence[.]" Defendants also request an evidentiary hearing and that the Court impose sanctions on the government. The government opposes the motion.[2] For the following reasons, the motion is denied.

## I.

The allegations in the second superseding indictment are familiar to the Court.[3] On August 31, 2018, the government filed its notices of intent to seek the death penalty as to George, Johnson, and Ofomata.[4] Each notice of intent states that

---

[1] R. Doc. No. 1032.
[2] R. Doc. No. 1077.
[3] *See generally* R. Doc. No. 237.
[4] *See* R. Doc. Nos. 147–149. The government filed its amended notice of intent to seek the death penalty as to George on June 19, 2019 and its second amended notice of

the government "believes the circumstances of the offenses charged in Count 3 of the Superseding Indictment are such that in the event of a conviction, a sentence of death is justified . . . and will seek the sentence of death for this offense."[5]  Count 3 alleges that the defendants, along with co-defendants Jeremy Esteves and Robert Brumfield, III (jointly, the "non-capital defendants), "aiding and abetting each other, did knowingly use, carry, brandish, and discharge firearms during and in relation to crimes of violence . . . and in the course thereof caused the death of Hector Trochez through the use of firearms," and that the killing is murder in that it was committed in perpetration of a robbery affecting commerce.[6]

## A. Robert Donnell

The subject of the instant motion is evidence that the government seeks to introduce at trial based on Donnell's observations of the underlying crime. Defendants object to the government's handling of that evidence—particularly to the misplacement of a recording of the government's initial interview with Donnell following the offense.  Before addressing the arguments, the Court will state the relevant facts and circumstances precipitating the instant motion.

---

intent to seek the death penalty as to George on July 1, 2019.  *See* R Doc. Nos. 393 and 409.

[5] R. Doc. No. 148, at 1; R. Doc. No. 149, at 1; R. Doc. No. 409, at 1. The government filed its second superseding indictment on February 7, 2019. *See* R. Doc. No. 237. No material changes were made to Count 3. *Compare* R. Doc. No. 23, at 3, *with* R. Doc. No. 237, at 3.

[6] R. Doc. No. 237, at 3.

During the commission of the robbery and murder of Hector Trochez, on December 18, 2013, at about 10:45am, Donnell happened to be "positioned at a stoplight at a nearby red light[,]" inside his vehicle.[7]  According to Donnell:

> I heard several gunshots. I turned my head. I saw two men with black hoodies standing on the side of a gray SUV on the floorboard rail leaning over the door, and they were shooting at someone. And at that time, a couple -- well, one more guy came running into the back seat of the brown -- the gray SUV, the dark SUV, and they proceeded to all get in and try to leave[.][8]

Donnell followed the SUV as it exited the parking lot of the Chase Bank, where the shooting had occurred.[9]  Donnell dialed 911.[10]  As he trailed the SUV, he narrated to the 911 operator what he saw.

According to the government's summary of the 911 call recording:

> During his pursuit of the vehicle, Donnell alerted the 911 operator of the direction of the fleeing vehicle, and provided a description of the Tahoe and the license plate number affixed to the Tahoe. Donnell continued to trail the vehicle until he reached a secondary location. Upon arriving at the location, Donnell observed the individuals exit the Tahoe and enter into an awaiting vehicle, which he described to the 911 operator. Donnell continued to follow the vehicle until he eventually lost sight of the vehicle. [11]

---

[7] R. Doc. No. 1077, at 2.

[8] R. Doc. No. 1077-1, at 2 (official transcript of Donnell's testimony at the trial of the non-capital defendants).  The Court notes that the government, summarizing the underlying facts in its briefing for the instant motion, stated that "Donnell observed three individuals, dressed in black, exit their vehicle and fire weapons at Trochez." R. Doc. No. 1077, at 2.  However, this summary by the government is at odds with Donnell's testimony, a transcript of which the government attached to its opposition. *See* R. Doc. No. 1077-1, at 2.  Most significantly, Donnell did not testify that he saw three individuals fire weapons; he stated that he saw two.  R. Doc. No. 1077-1, at 2.

[9] R. Doc. No. 1077, at 2; *see also* R. Doc. No. 1077-1, at 2, 11.  The Court notes that video evidence establishes that there were three shooters.

[10] *See* R. Doc. No. 1077-1, at 5.

[11] R. Doc. No. 1077, at 2.

Later, Donnell testified that he "was on the phone with 911 trying to give them everything I saw."[12]

That afternoon, Donnell was interviewed at the New Orleans Police Department ("NOPD") homicide office by FBI Special Agent Jennifer Terry and, presumably, an officer with NOPD.[13]  Terry did not herself record the interview, but she documented it in an FBI 302.  According to the government's opposition to the instant motion, "[d]uring the interview, Donnell recounted his observations of the shooting at the bank and what he observed when he arrived at the . . . secondary location where the perpetrators exchanged vehicles."[14]  The interview was recorded.[15] According to the government, "Donnell's recorded interview was placed in the NOPD homicide file, where it was maintained in the custody of the NOPD."[16]  The government further states that "[t]he details relayed by Donnell during his interview are detailed in the NOPD supplemental report and the FBI 302."[17]

At a later date, according to the government, Donnell "contacted the FBI requesting an opportunity to listen to his 911 recording[,]" and the FBI granted the request.[18]  This meeting "was not recorded."[19]  During it, "Donnell was given the

---

[12] R. Doc. No. 1077-1, at 5.
[13] R. Doc. No. 1077-1, at 12 (stating that the interview took place on the day of the offense).
[14] R. Doc. No. 1077, at 2.
[15] *See id.* at 3 (referencing "Donnell's recorded interview").
[16] *Id.*
[17] *Id.* at 2–3.
[18] *Id.* at 4.
[19] *Id.*

opportunity to listen to his 911 recording."[20]    Additionally, according to the government, while in the FBI agent's office, "Donnell observed photographs of the [alleged] perpetrators on the agent's desk. Donnell asked if he could view the photographs."[21]  The FBI agent granted this request as well.[22]

According to the government:

> In preparation for tendering discovery in this case, the undersigned requested that the NOPD produce a complete copy of the homicide case file to the government. Prior to this request, the government had not been presented with the entirety of the case file. Additionally, the FBI was not provided with a copy of the NOPD case file. The homicide file was maintained by the New Orleans Police Department, not the federal government. During a review of the file at the NOPD homicide office, the government informed NOPD Detective Jefferson that the homicide file **did not contain Donnell's recorded statement**. In addition to Donnell, the file was missing the recorded statements of Chase Bank employees who were interviewed. The government was informed that the NOPD would make efforts to locate the recordings. In addition to contacting Detective Jefferson, the government contacted a second homicide detective responsible for recording the statements of the bank employees in an effort to determine if the detectives knew the whereabouts of the statements. The detective was unable to provide information about the location of the statements.[23]

In its initial discovery production, the government referenced "a recorded statement obtained by the New Orleans Police Department from Mr. Robert Donnell, in a document identified by the government as LOOMIS000028."[24]  According to the government's summary, Donnell claimed to have witnessed "the entire incident, and

---

[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.* at 3 (emphasis added).
[24] R. Doc. No. 1032-1, at 2.

followed the suspect in this area where he called the police."[25]  Shortly thereafter, defendants jointly requested discovery of the recorded interview of Donnell in a letter dated January 16, 2018.[26]

On May 29, 2019, U.S. Magistrate Judge Dana Douglas and the government discussed, on the record, the whereabouts of certain recorded witness statements and interviews, including Donnell's.[27]  According to a transcript of the exchange, the U.S. Magistrate Judge asked the government why the government intended to provide defendants with summaries of the recorded statements of the witnesses: "Why not the actual statements?"[28]  The government answered, "That's what the NOPD gave us . . . . [W]e do not have a discrete statement by these witnesses."[29]  The U.S. Magistrate Judge, seeking clarification, asked if that meant "that NOPD does not have those statements[.]"[30]  In answer, the government stated that "we're going to go over to the NOPD next week and we're going to crosscheck."[31]  In an Order issued

---

[25] *Id.*

[26] R. Doc. No. 1032-2, at 1 ("Please provide the recorded interview [ ] of . . . Robert Donnell.  (LOOMIS000028)."); *see also* R. Doc. No. 1032-1, at 2.  Defendants note that they "have also made specific multiple requests for *Brady* and *Giglio* evidence and litigated multiple Motions to Compel the discovery requested."  *Id.*

[27] *See* R. Doc. No. 1032-1, at 3–5 (reproducing the exchange with emphasis added).

[28] *Id.* at 3 (quoting the transcript from the October 30, 2019 motion hearing, at 17–19).

[29] *Id.* (quoting the transcript from the October 30, 2019 motion hearing, at 17–19).

[30] *Id.* (quoting the transcript from the October 30, 2019 motion hearing, at 17–19).

[31] *Id.* at 4 (quoting the transcript from the October 30, 2019 motion hearing, at 17–19) (continuing, "I think everything is going to be obviated. We will see if there are any underlying separate statements that were then incorporated into the supplemental report. If there are, [defendants]'ll get them. We don't have them. We'll see if they exist.").

after that exchange, the U.S. Magistrate Judge reminded the government of the scope of its obligations under *Brady*.[32]

According to the government, on June 4, 2019:

the government met with Detective Jefferson a second time at the NOPD homicide office. During this meeting, the government obtained an electronic copy of what has been represented upon [sic] the entirety of the NOPD homicide file. Upon reviewing the file, the government contacted Detective Jefferson to inquire, again, about the missing recording. The government was informed by Detective Jefferson that he would continue to search for the recording.[33]

Apparently, Jefferson did not find the recording.

In a letter addressed to defendants' counsel and dated October 28, 2019, the government listed the "supplemental discovery items" that it had just made available to said counsel, including a "Transcript of Robert Donnell's 911 call" and "Photographs shown to Robert Donnell[.]"[34]  In that same letter, the government

---

[32] *See id*. at 6 (quoting R. Doc. No. 462, at 7 ("Further, the Court remarks that at the oral hearings on the various *Brady* motions that have been before the Court, the government has equated *Brady* material with material that will "exonerate" defendants. This Court reminds the government that this is not the *Brady* standard. 'Exoneration' and '*Brady*' are not synonymous. Brady material is **any** evidence favorable to the accused "where the evidence is **material** either to guilt or to punishment." 373 U.S. at 87 (emphasis added). This definition encompasses a larger swath of material than material that would merely exonerate a defendant. Moreover, and as this Court noted above, 'the individual prosecutor **has a duty** to learn of any favorable evidence known to the **others acting on the government's behalf** in th[e] case, including the police.' *Strickler*, 527 U.S. at 281 (citation and internal quotation marks omitted) (emphasis added). That means that the government may not simply wait and see whether any *Brady* material may arise during its investigation. The government has an affirmative duty to search for *Brady* material and should actively do so.") (emphasis in original)).

[33] R. Doc. No. 1077, at 3–4.

[34] R. Doc. No. 1032-2, at 4.

informed defendants that it had been "unable to locate" the recording of the interview.[35]  In relevant part, the letter states:

> Also note, per NOPD they are unable to locate interview recordings of Robert Donnell, Kayla Abram, Tony Hernandez, Irene Hernandez, Mary Caire, Aisha Gooden, Wesley Finner, and Dana Zeringue (as noted in NOPD reports).  NOPD will provide written confirmation that they are unable to locate these recordings.[36]

Two days later, on October 30, 2019, during a motion hearing before this Court held in advance of the November 2019 trial of the non-capital defendants, the government, for the first time, "advised that color photographs of the five defendants were shown to Mr. Donnell, in preparation for his testimony at trial, in a one-by-one display of each of the five defendants."[37]  According to the government, upon viewing the photographs, Donnell could not identify any defendant.[38]  The Court questioned the government about whether Donnell's inability to identify anyone from the photographs was exculpatory.[39]  The government responded that Donnell's inability to identify anyone was "not exculpatory.  That's neutral.  Neutral information is not *Brady*."[40]

The next day, October 31, 2019, counsel for George sent a letter to the government seeking discovery of documents related to the possession of the recording

---

[35] R. Doc. No. 1032-1, at 6; R. Doc. No. 1113, at 1; *see also* R. Doc. No. 1077, at 4.
[36] R. Doc. No. 1032-2, at 2 (reproducing R. Doc. No. 800-2, at 4) (emphasis removed).
[37] R. Doc. No. 1032-1, at 6.
[38] *Id.*
[39] *Id.* (quoting the transcript from the October 30, 2019 motion hearing, at 10–11).
[40] *Id.* at 7 (quoting the transcript from the October 30, 2019 motion hearing, at 10–11).

of Donnell's interview and the government's efforts to locate it.[41]   In that letter, counsel for George emphasized that in none of the previously discovered material had Donnell indicated that he observed face coverings or masks obfuscating his view of the faces of the individuals completing the criminal activity.[42]   Therefore, counsel for George argued that, "[w]hen considered in the context of Mr. Donnell having viewed photographs of the accused without making an identification, the recording is revealed to be exculpatory evidence, the government's notions about 'neutral' evidence notwithstanding."[43]   The government did not reply to this request.[44]

---

[41] R. Doc. No. 800-2 (reproducing letter).   Specifically, counsel for George sought discovery "of the following evidence and information:

1. When did the government attorneys first seek to secure or take possession of the recording?
2. How did the government attorneys communicate their desire to secure or take possession of the recording?
3. What steps, if any, did the government attorneys take to secure or preserve the recording?
4. When did the government attorneys first learn that the recording could not be located?
5. How were the government attorneys informed that the recording could not be located?
6. Provide copies of any and all communications between the government and its agents and the pertinent law enforcement agencies involved, including the NOPD, regarding the answers to numbers 1 through 5, above, including email chains, memos, letters, or any other documents regarding the attempt to locate, acquire, secure, or dispose of the referenced recording."  R. Doc. No. 800-2, at 6; R. Doc. No. 800-1, at 3–4.

[42] R. Doc. No. 800-2, at 6.

[43] *Id.*

[44] R. Doc. No. 800-1, at 4.

During the trial of the non-capital defendants, Donnell testified.[45]  In his testimony, Donnell stated what he observed from his car on the morning of December 18, 2013.  He described how he followed the vehicle along an indirect route:

> We made -- we met up at one corner. They went straight; I went straight. Then we met up at the next corner, catty-corner, away from where I'm going. They went straight again; I went straight again. So now we're going to go to our third catty-corner back -- going away from the bank towards the river.
>
> And then they must have beat me to it, and they went a couple streets ahead of me. I seen them go in front of me, but I wasn't to the corner yet. So when I got to the corner, the SUV was gone. Then I made another corner and I'm heading -- I don't recall the street name, but I'm heading towards the river. And I went a couple of blocks, and I saw two gentlemen running out of a back yard. And by this time, I'm two houses up the street from them, and they got into shade of green Honda, a little Honda[.][46]

The government asked whether Donnell stopped as he saw the people entering the Honda.[47]  "No, sir," Donnell stated, "I continued to roll on."[48]

On cross-examination, Donnell confirmed that on the same day as the crime, he went to the NOPD and "made a statement to the police" about what he saw occur.[49] Donnell further confirmed that he made a statement to "[a] lady FBI" agent and that the information he relayed during his interview was more detailed than what he recalled at the time of the trial of the non-capital defendants.[50]  Specifically, when

---

[45] R. Doc. No. 1032-1, at 8; R. Doc. No. 1077-1 (copy of the official transcript of Donnell's testimony spanning twenty-three pages).
[46] R. Doc. No. 1077-1, at 4.
[47] *Id.* at 10.
[48] *Id.*
[49] *Id.* at 13.
[50] *Id.* at 19.

asked if he "remember[ed] telling [the agent] that [one of the men Donnell observed] was wearing a baseball cap[,]" Donnell answered, "I do not think I ever said baseball cap. I may have said cap. I think it was a knitted cap. Things were hectic at the NOPD."[51] When asked if he "remember[ed] telling her that [one of the men he observed] was wearing a light colored shirt[,]" Donnell answered, "I do not remember that, but if that's what I said that day, it was fresh in my mind that day."[52] And when asked if he "remember[ed] talking about the gentleman with the passenger side -- getting into the passenger side as having a light colored shirt also[,]" Donnell answered, "I do not remember if I said that. Again, if I said it that day, then I'm confident in my memory."[53] Donnell also recalled that one individual he saw driving a vehicle "appeared to be about 160 pounds, and he – if I remember correctly, he may have had a cap, a knitted hat maybe."[54] As to that individual's hair, Donnell stated that he "[p]ossibly had dreadlocks hanging out[;]"[55] Donnell answered affirmatively when asked whether the driver was "[m]aybe medium complected?"[56]

Throughout Donnell's testimony at the trial of the non-capital defendants, "counsel for either George, Ofomata, or Johnson were present[,]" and, pursuant to an Order from the Court, were permitted to take notes.[57] According to defendants,

---

[51] *Id.*

[52] *Id.*

[53] *Id.* at 20.

[54] *Id.* at 15.

[55] *Id.*

[56] *Id.* at 16. The Court cannot determine whether the questions asked of Donnell during cross-examination resulted from information provided based on law enforcement summaries of Donnell's interview or the 911 transcript.

[57] R. Doc. No. 1077, at 4.

during his testimony, Donnell "made it clear that what he told the police in that recording on the day of the crime in December 2013 was more detailed than what he could remember at trial in November of 2019."[58]  The non-capital defendants were found guilty.

"Subsequently,"[59] the government provided the capital defendants with a letter, a copy of which defendants appended to the instant motion and which the government also attached to its opposition.[60]  The letter, from Lieutenant Wayne M. DeLarge II, New Orleans Police Department, Commander, Homicide Section, is addressed to United States Attorney for the Eastern District of Louisiana Peter G. Strasser and dated March 13, 2020.  The letter states, in full:

> Please note this correspondence shall serve as a formal response concerning missing items, specifically recorded interviews, as it relates to New Orleans Police Department Item number L-24488-13, which was a Homicide by Shooting Incident that occurred on December 18, 2013, at 2331 South Carrollton Avenue, New Orleans, Louisiana . . . . The investigation was assigned to New Orleans Police Department Homicide Detective Joseph Jefferson.
>
> Detective Jefferson was assisted by other members of the Homicide Section, who met with and interviewed known individuals.  The interviews were said to be recorded and relinquished to Detective Jefferson.  However, after diligent and exhaustive searches of the homicide case file, electronic mail, and detectives' digital recorders, the recorded statements cannot be located.  Based upon the aforementioned, the New Orleans Police Department's Homicide Section cannot produce the requested recorded statements.  The missing recorded interviews are of the following individuals: Robert Donnell, Kayla Abram, Tony Hernandez, Irene Hernandez, Mary Caire, Aisha Gooden, Wesley Finner, and Dana Zeringue.[61]

---

[58] R. Doc. No. 1032-1, at 9.
[59] *Id*. at 8.
[60] R. Doc. Nos. 1032-2, at 5 1077-2, at 1.
[61] R. Doc. Nos. 1032-2, at 5; 1077-2, at 1.

Accordingly, neither the government nor defendants possess the recording of Donnell's interview by law enforcement on the date of the underlying offenses.

## B. Procedural History Related to Donnell's Evidence

This Court and the U.S. Magistrate Judge have previously addressed issues related to Donnell's recorded statement.[62]  In July of 2019, the U. S. Magistrate Judge considered, among other motions, three motions,[63] filed by each defendant separately,

---

[62] *See* R. Doc. Nos. 335, 337, 372; *see also* R. Doc. No. 1077, at 5 ("Defendants have robustly litigated Donnell's recorded statement to NOPD, as it relates to their characterization of the statement as exculpatory.").

[63] R. Doc. No. 335, at 11–12 (motion by Ofomata to Compel Production of Exculpatory Materials, specifically requesting:

> Statements of witnesses to the robbery and shooting who do not identify Chukwudi Ofomata by name. Statements include but are not limited to: recorded statements (audio and/or audio/visual), signed statements, notes of statements, summaries of statements, and grand jury testimony in the possession of all law enforcement agencies, including but not limited to the FBI, New Orleans Police Department (NOPD), Jefferson Parish Sheriff's Office (JPSO), Tulane University Police, U.S. Attorney's Offices, Louisiana State Police Crime Lab, and Department of Justice (DOJ)

and

> Statements of witnesses to the robbery and shooting who describe the robbers involved differently than 5'11", 215 pounds, with short hair (no dreadlocks). Statements include but are not limited to: recorded statements (audio and/or audio/visual), signed statements, notes of statements, summaries of statements, and grand jury testimony in the possession of all law enforcement agencies, including but not limited to the FBI, New Orleans Police Department (NOPD), Jefferson Parish Sheriff's Office (JPSO), Tulane University Police, Louisiana State Police Crime Lab, U.S. Attorney's Offices and Department of Justice (DOJ).);

R. Doc. No. 337-1, at 10–11 (motion by George to Compel Exculpatory Information and Materials, including "Statements of witnesses to the charged robbery and shooting who do not identify Lilbear George as a participant" and "Statements of witnesses to the charged robbery and shooting who describe the perpetrators

to compel the production of exculpatory information and materials.[64]   The U. S.
Magistrate Judge found that defendants' request for (1) "statements of witnesses to
the robbery and shooting who do not identify Ofomata by name"[65] and for (2)
"statements of witnesses who describe defendants differently," two categories into
which Donnell's statements at his initial interview fall, was not "covered under
*Brady*" because such evidence was "neutral" rather than exculpatory or impeachment
evidence.[66]

On October 8, 2019, this Court issued an Order and Reasons[67] denying
defendants' motion[68] to reconsider the U.S. Magistrate Judge's Order.   The Court

---

differently than the appearance of Lilbear George, 5'8' medium weight, light skinned,
with long "good" or non-dread-locked hair."); R. Doc. No. 372, at 4 (motion by Johnson
to Compel Production of Exculpatory Information and Materials, including
"Statements of witnesses to the charged robbery and shooting who do not identify
Curtis Johnson as a participant or who describe the perpetrators differently than the
appearance of Curtis Johnson.").

[64] R. Doc. No. 462.

[65] R. Doc. No. 462, at 3.   The Court notes that the government misquotes the U.S.
Magistrate Judge.   The government states, as if quoting the U.S. Magistrate Judge,
that the U.S. Magistrate Judge "stated that that [sic] 'statements of witnesses to the
robbery and shooting who did not identify *defendants* by name'" were "neutral and
not *Brady*." R. Doc. No. 1077 at 5–6 (misquoting R. Doc. No. 462, at 3).   In fact, the
U.S. Magistrate Judge addressed only "statements of witnesses to the robbery and
shooting who do not identify Ofomata by name." R. Doc. No. 462, at 3.   However, the
Court has since clarified that this determination by the U.S. Magistrate Judge does
apply equally to George and Johnson.   *See* R. Doc. No. 623, at 15–16 (stating that
"requests 1, 4, 5, 14, and 16, which the Magistrate Judge enumerated relative to
Ofomata, were similarly made by Johnson and/or George" and that "[t]he Magistrate
Judge's rulings . . . relative to Ofomata apply equally to the identical requests by
George and Johnson.").

[66] R. Doc. No. 462, at 4.   The U.S. Magistrate Judge also addressed other requests not
pertinent to the instant motion.

[67] R. Doc. No. 623.

[68] R. Doc. No. 535.

reasoned that the U.S. Magistrate Judge's rulings with respect to requests 1 and 2, *supra*, "were not clearly erroneous because it appears that the government has already provided the defendants with the information requested within these categories to the extent that such information is in the government's possession" and because "for statements of witnesses to the robbery, the government provided the defendants with the New Orleans Police Department ("NOPD") supplemental homicide report, which 'summarizes all witness statements.'"[69]  However, the Court added in a footnote that "the Court does not agree that these requests all pertain to neutral evidence not subject to disclosure under *Brady*, [but] the Court finds . . . that the government has satisfied its *Brady* obligation as to such evidence of which the government is aware."[70]

On February 5, 2020, George filed a motion[71] to compel discovery of evidence concerning Donnell's missing recorded statement.  In that motion, George described the spoilation of evidence doctrine and stated that the government had failed to reply to George's earlier letter, dated October 31, 2019, requesting discovery as to the missing recording of Donnell's interview.[72]  Upon receipt of the motion, the U.S. Magistrate Judge ordered the government to obtain information from the NOPD

---

[69] R. Doc. No. 623, at 9.  Because the government states that it has not provided defendants with an unredacted version of the NOPD supplemental report, *see* R. Doc. No. 1077, at 3, 10, the Court presumes this disclosed statement is a redacted version of the same.

[70] R. Doc. No. 623*,* at 8 n.23.  *See* additional discussion, *infra*.

[71] R. Doc. No. 800.

[72] *Id*. at 4.

explaining the whereabouts of the recording.[73]  On March 19, 2020, after conducting

oral hearings[74] and upon receipt of the letter from NOPD that the recording could not

be located, the U.S. Magistrate Judge issued an Order[75] denying George's motion[76] to

compel discovery of the recording of Donnell's statement on the ground that the U.S.

Magistrate Judge could not compel a party to produce what that party "does not

have."[77]  The Order did not address whether the underlying content was potentially

exculpatory.[78]

### C. Status of Evidence Related to Donnell

According to the government, it has disclosed to defendants: (1) the audio

recording of Donnell's 911 call;[79] (2) a transcript of Donnell's 911 call;[80] and (3) copies

of the photographs Donnell observed during his visit to the FBI Office.[81]  Additionally,

defendants possess Donnell's transcribed testimony from the trial of the non-capital

defendants.[82]

---

[73] R. Doc. No. 862 ("IT IS FURTHER ORDERED that Defendant George's Motion to Compel Discovery of Evidence Concerning "Missing" Witness' Recorded Statement [Doc. #800] is TAKEN UNDER ADVISEMENT. No later than ten (10) days from the date of this minute entry, the parties shall send letters to the Court's eFile box to inform it of the government's request to the New Orleans Police Department.") (emphasis removed).

[74] R. Doc. No. 373 & 414.

[75] R. Doc. No. 874

[76] R. Doc. No. 800.

[77] R. Doc. No. 874, at 1.

[78] *See id.*

[79] R. Doc. No. 1077, at 2.

[80] R. Doc. No. 800-2, at 4 (reproducing the list of supplemental discovery provided by the government to defendants on October 28, 2019).

[81] R. Doc. No. 1077, 4–5 ("The government has provided defendants with the photographs that Donnell observed.").

[82] *Id.* at 4.

The government has in its possession, but has not yet disclosed to defendants, (1) "the unredacted NOPD supplemental report" and (2) "the FBI 302" related to Donnell's initial law enforcement interview, because, according to the government, "those reports are protected from disclosure at this time by the *Jencks* Act."[83]  The government states that it intends to provide those two documentations of Donnell's statements to defendants "two weeks before trial"[84] and that it "is prepared to produce the statements should [the] Court order such."[85]

### III.

Defendants assert in their motion that "through the wilful [sic] dilatory neglect of the government, the[y] have been denied access to an irreplaceable and unique piece of evidence: the recorded statement to law enforcement of an eye witness to the entire criminal episode."[86]  The consequences of this unavailability are, according to defendants, manifold.  First, "[w]ithout that 'best evidence' recording, the defendants are now left unable to effectively cross-examine Mr. Donnell at trial."[87]  Second, "[i]n any multiple defendant death-penalty case, life or death turns on the relative culpability of the defendants.   In this three-defendant death penalty case, the recorded statement of an eyewitness who saw only two active shooters takes on added importance."[88]

---

[83] R. Doc. No. 1077, at 2–3.
[84] R. Doc. No. 1077, at 10.
[85] *Id.* at 12.
[86] R. Doc. No. 1032-1, at 9.
[87] *Id.* at 9.
[88] *Id.* at 9.

As such, defendants move the Court, pursuant to the Fifth, Sixth, and Eighth Amendments to the United States Constitution, and Federal Rules of Evidence 104, 403, and 701,[89] to exclude the testimony of Donnell on the ground that such testimony violates the Due Process, Equal Protection, and Cruel and Unusual Punishment clauses; is tainted; is unreliable; and "its probative value is substantially outweighed by the danger of unfair prejudice."[90]  Defendants also move the Court to sanction the government by prohibiting the death penalty, on the theory that the government should be prohibited from seeking that penalty, because of the government's "mishandling of critical evidence."[91]  Defendants request that, "[a]t a minimum," the Court conduct an evidentiary hearing to ascertain "the circumstances of the loss of the evidence[.]"[92]

The government opposes the motion and describes defendants' arguments as "nothing more than hyperbole."[93]  In addition to asserting that defendants fail to establish any of the alleged claims, the government disagrees that defendants are unable to prepare an effective defense because they lack the recorded statement.[94] Acknowledging that the reports (and therefore, in all likelihood, the recording) contain some inconsistencies with Donnell's trial transcript and/or 911 recording, the government asserts that "[m]ere inconsistencies are not tantamount to exculpatory

---

[89] R. Doc. No. 1032, at 1.
[90] *Id.*
[91] *Id.*
[92] *Id.*
[93] R. Doc. No. 1077, at 1.
[94] *Id.* at 9 (stating that defendants "should be sufficiently capable of making effective use out of Donnell's statements").

evidence."[95]    As to an inconsistency regarding the make of a car apparently highlighted by the reports (and therefore, in all likelihood, the recording), the government concedes that this "falls under the umbrella of impeachment evidence" but insists that it is "not exculpatory."[96]

The government "concede[s]" that "the 'best evidence' of the recorded statement is in fact the recorded statement," but argues that "the two reports detailing Donnell's statements are comparable to Donnell's recording" and that, moreover, defendants have "had the opportunity to sit through the [Brumfield and Esteves] trial, and compare the trial transcript to the 911 recordings[.]"[97] As such, according to the government, "[t]he totality of all of Donnell's statements more than suffice for the absence of the recorded statement, which is memorialized in the NOPD supplemental report and FBI 302."[98]  The government further argues that defendants "are aware of Donnell's inconsistences and have ample time prior to trial to prepare for cross-examination of Donnell about his inconsistencies[.]"[99]

The Court will first address defendants' arguments for exclusion grounded in the U.S. Constitution.  Second, the Court will consider defendants' arguments grounded in the Federal Rules of Evidence.  Finally, the Court will turn to defendants' requests for an evidentiary hearing and sanctions.

**IV.**

---

[95] *Id*. at 12.
[96] *Id*. at 9.
[97] *Id*.
[98] *Id*.
[99] *Id*. at 7.

Defendants make three constitutional arguments as to why Donnell should be excluded as a witness at trial.   The Court will address each in order.

## A. Due Process

The Due Process Clause of the Fifth Amendment of the United States Constitution requires that the prosecution disclose all evidence that favors a defendant which is material to the issue of guilt or which could impeach the testimony of any witness.   *Brady v. Maryland*, 373 U.S. 83, 87 (1963).   Accordingly, "the government violates the Constitution's Due Process Clause 'if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment.'" *Turner v. United States*, 137 S. Ct. 1885, 1888 (2017) (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012)); *see United States v. Bagley*, 473 U.S. 667, 675 (1985) (finding that due process requires the disclosure of all material exculpatory, favorable or impeachment evidence which "if suppressed, would deprive the defendant of a fair trial."); *Floyd v. Vannoy*, 894 F.3d 143, 161–62 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 573 (2018).

The government's *Brady* obligation "extends to impeachment evidence as well as exculpatory evidence."   *United States v. Swenson*, 894 F.3d 677, 683 (5th. Cir. 2018); *see Bagley*, 473 U.S. at 676 ("Impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule.") (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972) (requiring that evidence of an agreement between the government and key witness be disclosed).   The prosecution also has a duty to disclose any favorable evidence of which it is aware that could be used to obtain further evidence.   *See Giles v. Maryland*, 386 U.S. 66, 74 (1967); *Sellers v. Estelle*, 651 F.2d 1074, 1077 n.6 (5th

Cir. 1981) (evidence suppressed was material to the preparation of petitioner's defense, regardless whether it was intended to be admitted into evidence). However, the Fifth Circuit has held that "neutral" evidence does not fall "within the purview of *Brady*[.]" *See United States v. Johnson*, 872 F.2d 612, 619 (5th Cir. 1989) ("Neutral or inculpating evidence is not within the purview of *Brady*."); *United States v. Dillman*, 15 F.3d 384, 390 (5th Cir. 1994) (finding that statement that witness lacked recollection was neutral, not exculpatory).

The government's *Brady* obligation "exists irrespective of a request from the defense" and applies to "all evidence known not just to the prosecutors, but 'to others acting on the government's behalf in the case, including the police.'" *Floyd*, 894 F.3d at 161–62 (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)); *see Strickler v. Greene*, 527 U.S. 263, 281 (1999) (stating that prosecutors must comply with the duty articulated in *Kyles* "[i]n order to comply with *Brady*"); *United States v. Manners*, 384 F. App'x 302, 307–08 (5th Cir. 2010) ("It is well-settled that the government may be charged with the knowledge of its investigating agents."); *see also United States v. Antone*, 603 F.2d 566, 569–70 (5th Cir. 1979) (predating *Kyles*; rejecting the government's argument that knowledge should not be imputed from state investigators to the federal prosecutors because "the two represent entirely separate sovereigns[,]" and while not "endors[ing] a Per se rule[,]" (instead "prefer[ring[ a case-by case analysis of the extent of interaction and cooperation[,]") noting that the state and local government had "pooled their investigative energies to a considerable extent" including combined interview, and reasoning that "[i]mposing a rigid

distinction between federal and state agencies which have cooperated intimately from the outset of an investigation would artificially contort the determination of what is mandated by due process."); *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) ("The basic import of *Brady* is . . . that there is an obligation on the part of the prosecution to produce certain evidence actually or constructively in its possession or accessible to it in the interests of inherent fairness . . . If disclosure were excused in instances where the prosecution has not sought out information readily available to it, we would be inviting and placing a premium on conduct unworthy of representatives of the United States Government." (internal quotation omitted)).

Where the exculpatory value of evidence is apparent, the government's duty to disclose such evidence applies regardless of the good faith or bad faith of the prosecution. *See Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006). Where evidence's exculpatory value is "undetermined, but may be potentially useful to the defense, then a defendant must show that the government acted with bad faith in destroying the evidence" in order to establish a due process violation. *United States v. Salazar*, 317 F. Supp.3d 935, 937 (W.D. Tex. 2008) (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)) ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process." (internal quotation marks omitted)); *see also Illinois v. Fisher*, 540 U.S. 544, 547–48 (2004) (finding due process not violated where evidence was potentially exculpatory but the police acted "in good faith and according to normal police procedures"); *United State v. Moore*, 452 F.3d 382, 388 (5th Cir. 2006) (per

curiam) (holding that "absent a showing of bad faith, failure to preserve potentially useful evidence does not constitute a denial of due process"); *United States v. McNealy*, 625 F.3d 858, 868 (5th Cir. 2010) ("[F]ailure to preserve merely potentially useful evidence does not constitute a denial of due process absent a showing of bad faith.").

### 1. Arguments

In support of their claim that their right to due process has been violated, defendants cite *McNealy*, 625 F.3d, and argue that "the lost recording of Robert Donnell is at the very least 'potentially exculpatory'"[100] as to "one or all three" of them[101] and that the government has acted in bad faith.[102]   In support of this assertion of bad faith, defendants argue that the government has "revealed a flawed understanding of its responsibility to seek out such evidence, and once on notice of the request that such evidence be produced in discovery, failed to do anything in a timely fashion so as to see to its preservation, even if it was not yet ripe for disclosure."[103]

---

[100] R. Doc. No. 1032-1, at 14.

[101] *Id.* at 10.

[102] *Id.* at 15 (summarizing *McNealy*'s holding as: "Where it is shown that the lost evidence was material and exculpatory, or only potentially useful, but lost as a result of bad faith on the part of the government, the defendant has made a showing of a denial of due process").

[103] *Id.* (stating that:

> only in May of 2019, did the government for the first time tell the Court that they were going to personally going to go to [sic] the New Orleans Police Department offices to seek out the statements, and not until October, 2019, on the very eve of the non-capital trial, did the government actually bother to check and learn that the statements 'could not be located.');

The government flatly denies that defendants' due process rights were violated and dismisses defendants' arguments as "meritless."[104]  First, the government states that defendants have "no basis"[105] for their assertion that Donnell's recorded interview is exculpatory and asserts that defendant's argument "rests heavily on speculation."[106]  "On the contrary," the government avers, "Donnell's statements and trial testimony, even with minor inconsistencies, does [sic] not rise to the level of exculpatory evidence."[107]  According to the government, "[t]he statements provided by Donnell do not exculpate any of the defendants. In fact, Donnell's statements provide corroboration of the investigation."[108]  Indeed, according to the government, "Donnell's recorded statement, as summarized in the NOPD supplemental Report and FBI 302, is not favorable evidence that is material to the defendants guilty or punishment. At best, the evidence is neutral evidence that merely corroborates evidence that suggests the guilt of the defendants."[109]

---

*see also id.* at 5 (asserting that the government's exchange with the U.S. Magistrate Judge from May of 2019:

> is revealing on a few scores: 1) eighteen months after the indictment, the government had still not bestirred itself to seek out important evidence in the possession of the NOPD, only a mile away from its offices; 2) the government considered itself divorced from the police department upon which it relied to obtain the execution of three men; and, 3) on that date, May 29, 2019, the government promised the court on the record that it would get the recordings directly from the NOPD.).

[104] R. Doc. No. 1077, at 1 and 7.

[105] *Id.* at 7.

[106] *Id.* at 8.

[107] *Id.* at 7.

[108] *Id.* at 8.

[109] *Id.* at 10.

The government concedes that Donnell had made "inconsistent statements about the make of the vehicle, Honda versus Hyundai[,]" but that "while the inconsistency falls under the umbrella of impeachment evidence, it is not exculpatory."[110]  The government adds that "[t]he same pertains to any suggestion that Donnell misstated the number of individuals who he saw commit the murder and exit the getaway car."[111]  The government concludes that "[m]ere inconsistencies are not tantamount to exculpatory evidence [and] . . . . [t]he defendants have failed to show the recorded statement contained exculpatory information."[112]

The government also argues that defendants have "fail[ed] to show [a] bad faith motive by the government" for the recording's disappearance.[113]: "While the NOPD's failure to have maintained Donnell's recorded statement is negligent, there is no showing that the department acted in bad faith."[114]  The government adds that "as is pertinent to the [federal] government, there is no evidence offered that the government has participated in or acquiesced to the statement being unable to be located."[115]  Distinguishing between "the government" and the NOPD, the government explains that it "has not suppressed the recorded statement[,]" because it "neither possessed nor maintained custody of the statement."[116]  Accordingly, the

---

[110] *Id.* at 9.
[111] *Id.*
[112] *Id.* at 12.
[113] *Id.* at 9.
[114] *Id.* at 10.
[115] *Id.*
[116] *Id.* at 12.

government asserts that defendants "have failed to show that the government acted in bad faith as it relates to the absence of the recording."[117]

Finally, the government notes that in this case, because of the trial of the non-capital defendants, the capital defendants "have a unique opportunity that is seldom afforded defendants in that they currently know the details of a testifying witness' statement and testimony."[118]  The government states that, "[w]hile this does not absolve the government of complying with its *Brady* obligations, it is worth pointing out that the defendants have knowledge of what Donnell stated when he was interviewed by NOPD and knowledge of inconsistencies made [in] his 911 statement and his initial statement."[119]  Moreover, "[t]he substance of Donnell's statement is stated in the NOPD supplemental report and the FBI 302"[120]—and "[t]he government fully intends to provide the defendants with the statements so that they can make effective use of the statements at trial."[121]  In sum, the government asserts that "there is no *Brady* violation[,]"[122] and it argues that defendants' motion should be denied.[123]

In reply, defendants counter two points made by the government. First, defendants state that the government's claim "that the missing recording is not exculpatory" cannot possibly be supported by the evidence where the recording is

---

[117] *Id.* at 10.
[118] *Id.* at 11.
[119] *Id.* at 12.
[120] *Id.* at 8.
[121] *Id.* at 12.
[122] *Id.* at 11.
[123] *Id.* at 12.

unavailable.[124]  "[W]ithout the benefit of the recorded statement the government can only imagine its contents and only hope that it matches the reports."[125]  Defendants then delineate the specific details relayed by Donnell during his testimony at the trial of the non-capital defendants and explain that Donnell "recalled telling the police details regarding hairstyles and builds . . . [;] noting the [skin tone] of the Tahoe driver . . . . Given the centrality of his testimony in this case, particularly in view of the need for the jury to consider relative culpability among three death-eligible co-defendants,"[126] such evidence is "at the very least" potentially exculpatory,[127] particularly given the fact that "[Donnell] only saw *two* shooters."[128]  Second, defendants dispute the relevance of the government's argument that it cannot have acted in bad faith when it "neither possessed nor maintained custody of the statement."[129]  Defendants state:

> it bears repeating that the Magistrate felt constrained to emphasize to the government that it was responsible for far more than what found its way to the attorneys' desks at their offices on Poydras Street.  Rather, the government attorneys have an affirmative duty to seek out favorable evidence in the possession of others acting on its behalf.  Those others would include in this case the NOPD Homicide Section.[130]

*2. Analysis*

---

[124] R. Doc. No. 1113, at 2 ("The government states (without evidence) that the lost Donnell recording is not exculpatory and claims that, in any event, (without evidence) the police reports or 302s are 'comparable to Donnell's recording.'").

[125] *Id.*

[126] *Id.* at 2–3.

[127] *Id.* at 2.

[128] *Id.* (emphasis in original).

[129] *Id.* at 3.

[130] *Id.* at 3–4.

A defendant's due process rights are violated when the government, in bad faith, fails to preserve potentially useful evidence. *See Youngblood*, 488 U.S. at 57. In *McNealy*, the government destroyed the defendant's computer after duplicating the three hard drives therein. *McNealy*, 625 F.3d at 869. The defendant argued that the computer's destruction violated his due process rights because "the mishandling of the defective hard drive prohibited him from using 'exculpatory evidence potentially available on it'" and because, as a consequence of the computer's destruction, he was "forced to rely on the Government's claims that the two remaining hard drive copies were accurate[.]" *Id.* The Fifth Circuit found that the destroyed computer "should be considered 'potentially useful evidence' rather than 'material exculpatory evidence; because the defendant did 'not argue that he knows of any potentially exculpatory evidence, nor does he identify what evidence might be contained in the partially defective hard drive[.]" *Id.* Accordingly, the Fifth Circuit analyzed McNealy's due process claim under the "bad-faith standard." *See id.*

The Fifth Circuit found that the government "was at least negligent" in destroying the computer, *id.*, but affirmed the district court's finding that the government did not act in bad faith. *Id.* at 870. In reaching that conclusion, the *McNealy* court explained: "there is no evidence that they intended to destroy the evidence in order to impede McNealy's defense . . . . The original computer was destroyed as a result of miscommunication between divisions of the federal government, not as a result of bad faith." *Id.* The Fifth Circuit quotes the district court as explaining: "[T]here was not a real clear explanation to what happened to it.

It seems to me that there were several arms of the federal government working on this case and many other cases and that simply the evidence in being transported back to the FBI or back to some other federal agency was either misplaced or lost. There's no evidence here that this evidence was destroyed purposefully." *Id.* at 869.

### a. The Recording's Value Under Brady

The U.S. Magistrate Judge previously determined[131] that certain types of evidence, which included the recording of Donnell's statement, were neutral, not exculpatory, and did not constitute *Brady* material.[132]  The Court affirmed that the government had satisfied its *Brady* obligation, and it upheld the U.S. Magistrate Judge's Order.[133] However, that determination was made before it was clear to the U.S. Magistrate Judge, this Court, or the government, that said recording could not be located and before Donnell testified at the trial of the non-capital defendants.

Since the U.S. Magistrate Judge's Order and the Court's subsequent Order were issued, the unavailability of Donnell's recording has been established and portions of Donnell's testimony have called into question the government's assertion relative to the recording.  Moreover, the U.S. Magistrate Judge does not appear to have considered whether the evidence was "potentially exculpatory," which is relevant when analyzing the instant due process claim.[134]  Consequently, it would be

---

[131] R. Doc. No. 462, at 4 (Order of U.S. Magistrate Judge).
[132] R. Doc. No. 623, at 8 (Order and Reasons of the Court).
[133] *Id.*
[134] R. Doc. No. 462, at 4.

appropriate for the Court to re-visit the question of the recording's value under *Brady* to determine if it is potentially exculpatory.

Taking the government's assertions about the contents of the recording at face value, it seems possible that it could be potentially exculpatory. Evidence is potentially exculpatory where its exculpatory value is indeterminate but "may be 'potentially useful' to the defense[.]" *United States v. Murray*, No. 19-118, 2020 WL 5311455, at *5 (E.D. La. Sept. 4, 2020) (Vitter, J.) (internal quotation omitted). The government has acknowledged that the reports (which it claims, as it must, mirror the substance of the recording) contain some inconsistencies with Donnell's other statements. Frustratingly, the NOPD's failure to preserve the recording leaves the Court in the near-impossible position of evaluating the value of evidence it cannot review. *See California v. Trombetta*, 467 U.S. 479, 486 (1984) (observing that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed").

However, the government concedes (again relying on the premise that the recording mirrors in substance the reports) that the recording includes "inconsistencies" and that at least two of these inconsistencies "fall[] under the umbrella of impeachment evidence."[135] And the Supreme Court has made clear that "[i]mpeachment evidence . . . falls within the *Brady* rule." *Bagley*, 473 U.S. at 676.

---

[135] R. Doc. No. 1077, at 9. The concession was made in reference to a discrepancy regarding the make of the car; the government adds that "[t]he same pertains to any suggestion that Donnell misstated the number of perpetrators Donnell saw." *Id.*

In light of the government's concession that the lost recording contains "impeachment evidence"—and ill-equipped to probe the precise exculpatory value of evidence it cannot review—the Court will assess whether the events that resulted in the evidence being unavailable to defendants satisfy the "bad faith standard." *McNealy* 625 F.3d at 869.

### b. Bad Faith

The Court finds that the government did not act in bad faith with respect to the recording of Donnell's interview. Although "there [i]s not a real clear explanation to what happened to" the recording, *McNealy*, 625 F.3d at 869, there is no evidence that the NOPD, or the FBI, "intended to destroy the evidence in order to impede [defendants'] defense." *Id.* at 870. Rather, it appears that the recording "was either misplaced or lost." *Id.* at 869. The government could have made greater efforts to locate the recording sooner than it appears to have taken measures to do so;[136] that failure indicates that the government, as in *McNealy*, may have been "negligent[.]" *Id.* at 869. But absent evidence of purposeful destruction or foul play,[137] the Court cannot conclude that the government—including the NOPD and FBI—acted in bad

---

[136] The government cites *Moore*, 452 F.3d at 388, in which the government's failure to preserve 344 tape recordings of conversations did not constitute a *Brady* violation where the defendant failed to describe a single exculpatory fact that might have emerged from the recordings and the government recycled the tapes after 180 days, as per policy. However, the government has not pointed to a policy pursuant to which the recording of Donnell's interview was made unavailable.

[137] The Court notes that there is no way of knowing when the recording of Donnell's statement was misplaced by NOPD. Accordingly, even if the government would have requested the recording on an earlier date, the Court has no way of knowing whether it would have been available. Furthermore, the government had no reason to anticipate that the recording would be lost or misplaced.

faith.  *See id.* at 870.  Therefore, the Court finds that government's actions with respect to the recording did not violate defendants' right to due process.

The Court must address the government's argument that it "neither possessed nor maintained custody of the [recorded] statement[.]"[138]  Though defendants have not demonstrated that the FBI or the United States Attorney's Office were in possession of the recording, the government has not explained why this fact is relevant, particularly in light of the government's coordination with NOPD.  Cases like *Kyles*, 514 U.S. at 437; *Floyd*, 894 F.3d at 161–62; and *Antone*, 603 F.2d at 569–70, address situations in which other entities *knowledge* of exculpatory evidence is imputed to the government.  Here, the government cannot suggest it was unaware of the recording's existence—indeed, it is quite possible that the government was aware of the recording from the moment it came into existence.[139]  The government cannot, possessing knowledge of impeachment evidence and working in close coordination with the evidence's custodian, rely on the fact that it is in someone else's possession

---

[138] R. Doc. No. 1077, at 12.

[139] *See id.* at 2–3 (noting that the interview was recorded, that FBI Agent Jennifer Terry was present, and that, upon reviewing the NOPD file "the government informed NOPD Detective Jefferson that the homicide file did not contain Donnell's recorded statement.")  Had the government been unaware of the recording's existence, it would not have known to notify the NOPD that the recording was missing.  That is not to say the government would have been aware of the recording's possible *Brady* value at the time of the interview (although, to the extent Donnell's testimony contradicted the 911 recording, the contradiction should have been apparent after the meeting in Special Agent Terry's office where that recording was replayed).  Because the Court does not find any conduct on the part of the NOPD or FBI that resembles bad faith, it need not address this question.

to avoid any potential for bad faith conduct.[140]  Accordingly, the Court reiterates the U.S. Magistrate Judge's previous conclusion that the government's obligations with respect to *Brady* are not limited to the U.S. Attorney's Office and, here, reach the NOPD.  As such, in this case, the government's efforts to distance itself from the NOPD are misplaced.  Should the recording at issue be located, "the Court reminds the government of its duty to supplement and to produce such evidence forthwith." *Jackson v. Johnson*, 194 F.3d 641, 649 n.18 (5th Cir. 1999) (noting that the *Brady* obligation continues throughout trial).

## B. Equal Protection

Though defendants state that the evidence should be prohibited from being introduced on equal protection grounds, defendants fail to provide any argument or support which would cause this Court to conclude that the introduction of such evidence amounts to a denial of equal protection.  Absent briefing, and because this claim does not sound in equal protection, *see City of Cleburne, Tex. v. Cleburne Living*

---

[140] Moreover, the Court notes that, even if the government *had* been unaware of the recording, the facts of this case would likely satisfy the sort of case-specific inquiry prescribed by *Antone*.  603 F.2d at 161–62.  Both law enforcement agencies were investigating the crime scene; representatives from both agencies were present at the interview.  Furthermore, NOPD witnesses testified at the trial of the non-capital defendants.  It could easily be said that this was sufficient to render the NOPD a "member[] of the prosecutorial team."  *Id*. at 570; *see also* The United States Dep't of Justice, Justice Manual, 9-5.001(B)(2) available at https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings (last accessed Oct. 26, 2020) ("It is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all members of the prosecution team. Members of the prosecution team include federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant.") (citing *Kyles*, 514 U.S. at 437).

*Ctr.*, 473 U.S. 432, 439 (1985) ("The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."), such claim is deemed waived.

### C. Cruel and Unusual Punishment

As with the equal protection claim, although defendants assert that allowing the introduction of the evidence would violate the Eighth Amendment, defendants neglect to provide argument addressing this issue. The issues alleged in the instant motion do not fit within the contours of Eighth Amendment claims. Furthermore, defendants have not sufficiently briefed this claim and, accordingly, it is deemed to be waived.

### V.

Defendants also assert that the Federal Rules of Evidence offer grounds for exclusion. As with the equal protection and cruel and unusual punishment claims, defendants do not offer particularized argument as to why any of the three specified Federal Rules of Evidence would be violated if the evidence were to be introduced. Rather, defendants state only, conclusorily, that it "is tainted, is unreliable, and its probative value is substantially outweighed by the danger of unfair prejudice."[141] Nevertheless, the Court will address each of the three evidentiary grounds in turn and consider whether any specified Federal Rule of Evidence offers a reason to preclude the evidence.

### A. Federal Rule of Evidence 104

---

[141] R. Doc. No. 1032-1, at 1.

Federal Rule of Evidence 104 provides in full:

**(a) In General.** The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege.

**(b) Relevance That Depends on a Fact.** When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later.

**(c) Conducting a Hearing So That the Jury Cannot Hear It.** The court must conduct any hearing on a preliminary question so that the jury cannot hear it if:

**(1)** the hearing involves the admissibility of a confession;

**(2)** a defendant in a criminal case is a witness and so requests; or

**(3)** justice so requires.

**(d) Cross-Examining a Defendant in a Criminal Case.** By testifying on a preliminary question, a defendant in a criminal case does not become subject to cross-examination on other issues in the case.

**(e) Evidence Relevant to Weight and Credibility.** This rule does not limit a party's right to introduce before the jury evidence that is relevant to the weight or credibility of other evidence."

Fed. R. Evid. 104.

Defendants do not indicate which aspect of Rule 104 may relate to Donnell's testimony or would prevent his testimony. In the absence of argument that Donnell's testimony is inadmissible, insufficiently relevant, privileged, or that he is unqualified to be a witness in this case, and based upon this Court's evaluation of the trial testimony, the Court finds that Rule 104 does not preclude Donnell's testimony.

## B. Federal Rule of Evidence 403

Rule 403 of the Federal Rules of Evidence states, in full:

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403. "The rules of evidence commit the weighing of prejudice and materiality to the sound discretion of the trial court," *United States v. Landes*, 704 F.2d 152, 154 (5th Cir. 1983), and accordingly, "[a] district court has broad discretion in assessing admissibility under Rule 403[.]" *United States v. O'Keefe*, 426 F.3d 274, 281 (5th Cir. 2005). The Court finds generally that the probative value of Donnell's testimony is not substantially outweighed by the danger of "unfair prejudice, confusing the issues, [or] misleading the jury [,]" and, as such, need not be excluded pursuant to Federal Rule of Evidence Rule 403. Any specific objections will be deferred until trial.

### C. Federal Rule of Evidence 701

Rule 701 of the Federal Rules of Evidence states, in full:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

**(a)** rationally based on the witness's perception;
**(b)** helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
**(c)** not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.[142]

Donnell will not testify as an expert, and defendants do not contend that Donnell would be offering testimony based on "specialized knowledge" or any other information within the wheelhouse only of experts, pursuant to Rule 702. Therefore,

---

[142] Federal Rule of Evidence 702 states: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." *Id.*

the relevant questions before the Court are whether the evidence he would provide are "rationally based" on his "perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue[.]" Fed. R. Evid. 701.

As Donnell claims to be an eyewitness and is supported in that assertion by the recording of his 911 call at the time of the robbery and murder at issue, the Court finds that the first question must be answered in the affirmative. Additionally, given that Donnell observed the underlying criminal conduct, the Court finds that Donnell would provide evidence that would be "helpful to clearly . . . determining a fact in issue[.]" Fed. R. Evid. 701. Accordingly, the entirety of Donnell's testimony should not be excluded pursuant to Rule 701. Any specific objections are deferred until trial.

## VI.

In light of the aforementioned concerns, defendants request that the Court (1) conduct an evidentiary hearing as to the whereabouts of the recording of Donnell's interview; and/or (2) impose sanctions on the government for its mishandling of this evidence. The Court will address these requests in that order.

### A. Conduct an Evidentiary Hearing

Defendants urge the Court to hold an evidentiary hearing "focused on the circumstances of obtaining of the recorded statement, its loss, the government's effort, or lack of effort, to secure it, and all other matters pertaining to this issue[.]"[143] In their initial motion, defendants propose a slate of questions the Court could pose

---

[143] R. Doc. No. 1113, at 6.

during such a hearing, including (1) "What steps, if any, did the government attorneys take to secure or preserve the recording?" and (2) "When did the government attorneys first learn that the recording could not be located?"[144]  Defendants argue that an evidentiary hearing is warranted given "the facts and history of this case" and because of the government's "fundamentally flawed appreciation of his obligations under *Brady* and *Kyles*[.]"  The evidentiary hearing should address, according to defendants, both the lost recording of Donnell's interview and "the failed photo-identification event" at the FBI office.[145]

The government opposes the request.[146]  The government argues that, "because the allegations offered by the defendant are meritless, the defendants are not entitled to an evidentiary hearing."[147]  The government asserts that "no legal authority require[es] the Court to hold an evidentiary hearing to explore the depths of alleged spoliation in a criminal case," and cites Fifth Circuit caselaw addressing the appropriateness of evidentiary hearings in a different context—namely, upon a defendant's motion to suppress.[148]  According to the government's summary of that body of caselaw, evidentiary hearings are not warranted where no "specific factual issues . . . are in dispute[.]"  *United States v. Massey*, No. 06-352, 2008 WL 1832546, at *1 (E.D. La. April 23, 2008) (Vance, J.); *see also United States v. Kirk*, 528 F.2d 1057, 164 (5th Cir. 1976).  The government states that "[i]n this case, there is no

---

[144] R. Doc. No. 1032-1, at 16.
[145] *Id.* at 10.
[146] R. Doc. No. 1077, at 12–14.
[147] *Id.* at 1.
[148] *Id.* at 13.

factual dispute[,]" and, therefore, "[t]here is simply no purpose in conducting an evidentiary hearing in this matter."[149]  The government reiterates that it "is not in possession, and never was in possession of the NOPD recording[]" and argues it "has acted with due diligence and in conformity with a court Order . . . by obtaining a written statement from the NOPD as it relates to the department's handling of Donnell's statement."[150]

Defendants disagree with the government's contentions that defendants have "not alleged any specific factual issues that are in dispute and merit an evidentiary hearing" and that the government "acted with due diligence" regarding the Donnell statement.[151]  The factual disputes, defendants maintain, are: (1) why the government "long ago did nothing to acquire or secure irreplaceable evidence in the possession of others acting on its behalf," prior to the colloquy with the U.S. Magistrate Judge; (2) "the government's continued suggestion that somehow the NOPD Homicide Section is not within the ambit of 'others acting on its behalf'"; and (3) "precisely when did the government seek to secure or obtain the sought-after-recording. Was it only in October of 2019 in the ramp up to trial of the noncapital defendants?  Was it only in response to the Magistrate's order of February 2020?"[152]

The Court finds that no evidentiary hearing is necessary for the Court to address the concerns underlying the present motion.  "A district court is not required

---

[149] *Id.*
[150] *Id.* (citing R. Doc. No 862 (Order of the U.S. Magistrate Judge)).
[151] R. Doc. No. 1113, at 4.
[152] *Id.* at 5–8.

to hold an evidentiary hearing on a pretrial motion." *United States v. Beard*, 761 F.2d 1477, 1480 (11th Cir. 1985) (citing *United States v. Fischel,* 686 F.2d 1082, 1095 (5th Cir. 1982)).    Though some circuits have developed tests for when pretrial evidentiary hearings may be warranted, *see, e.g.*, *United States v. Panitz,* 907 F.2d 1267, 1273–74 (1st Cir. 1990); *United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996), "Rule 12 does not by its terms specify when such a motion entitles a defendant to a pretrial evidentiary hearing[.]"    *Voight*, 89 F.3d at 1067.    Indeed, "[a] district court does not have to hold evidentiary hearing on a motion just because a party asks for one."  *United States v. Sophie,* 900 F.2d 1064, 1071 (7th Cir. 1990).

The Court finds that holding an evidentiary hearing would not aid in its resolution of the instant motion.   Defendants have offered only mere speculation as to why the recording was unavailable, and there has been no evidence presented whatsoever that the government acted in bad faith.   Accordingly, the Court denies defendants' request.

## B. Request for Sanctions

Next, defendants argue that the government should be subject to sanctions "for the loss or destruction of the interview" of Donnell.[153]   In support of sanctions, defendants cite *Salazar*, 317 F. Supp. 3d at 935.

The government argues that because it "has satisfied its discovery obligations to the extent that it can do so[,]" sanctions "are not merited."[154]  The government cites

---

[153] R. Doc. No. 1032-1, at 17.
[154] R. Doc. No. 1077, at 1.

*United States v. Kloszewski*, 760 F. App'x 12, 14 (2d Cir. 2019), a Second Circuit case describing the standard for dismissal based on spoliation of evidence where the exculpatory value of evidence is apparent before the destruction of said evidence.[155] The government also cites *United States v. Garrett*, 238 F.3d 293, 298 (5th Cir. 2000), a case which addresses how a district court should proceed when considering the imposition of sanctions for discovery violations in a criminal case.[156]

Additionally, the government contrasts the facts of the present situation with those in *Salazar*, 317 F. Supp. 3d at 935. In *Salazar*, the government asserts, "sanctions were appropriate" because, "the government destroyed obvious and exculpatory evidence" and "the comparable evidence, photos and video of the destroyed evidence, which the government provided, did 'not alleviate or remedy the problem[.]'"[157] In contrast, here, according to the government, "defendants have failed to prove that the government caused the statement's disappearance or otherwise acquiesced in the statement's unavailability."[158] Moreover, the government argues that "[a]lthough the government does not know why Donnell's statement was not preserved by NOPD, what is ***unequivocally*** known is that the statement was not exculpatory evidence, it was neutral."[159] Finally, the government states that it "intends to provide comparable evidence to the defendants that will

---

[155] *Id.* at 15.
[156] *Id.* at 15–16.
[157] *Id.* at 14 (quoting *Salazar*, 317 F. Supp.3d at 939).
[158] *Id.*
[159] *Id.* (emphasis in original).

alleviate and remedy the fact that the defendants do not have possession of Donnell's recorded statement."[160]

In the Fifth Circuit, a district court must consider four factors in exercising its "broad discretion when deciding whether to impose sanctions for discovery violations": "(1) why disclosure was not made; (2) the amount of prejudice to the opposing party; (3) the feasibility of curing such prejudice with a continuance of the trial; and (4) any other relevant circumstances." *Swenson*, 894 F.3d at 684 (quoting *Garrett*, 238 F.3d at 298). If, upon "carefully weigh[ing]" these factors, the district court decides sanctions would be appropriate, it "should impose the least severe sanction that will accomplish the desired result—prompt and full compliance with the court's discovery orders." *Id.* (reversing and remanding a district court's dismissal of an indictment upon an alleged *Brady* violation because "[t]he district court failed to impose the least severe sanction, and the government's violations of the discovery deadlines do not warrant dismissing the indictment with prejudice") (quoting *Garrett*, 238 F.3d at 298).

### 1. Prohibit the Death Penalty

Defendants request that the Court prohibit the government from seeking the death penalty on these grounds. As the government states, "defendants have not presented any law in support of their argument that the government's failure to produce Donnell's statement should bar the imposition of the death penalty."[161]

---

[160] *Id.*
[161] R. Doc. No. 1077, at 16.

42

Prohibiting the death penalty would not be the appropriate remedy, and the request for such a sanction is frivolous.

### 2. Exclude Witness

Defendants argue that the Court should exclude Donnell as a witness and prohibit the government from introducing "his story or testimony by way of hearsay[.]"[162]  In support of this remedy, defendants cite *Salazar*, 317 F. Supp. 3d at 943.  The government urges the Court to deny this request because its conduct is undeserving of sanctions and, should the Court decide to impose sanctions, excluding Donnell would not be the "least severe sanction," as counseled by *Garrett*, 238 F.3d at 298.[163]  For reasons previously stated, the Court also finds this sanction would be inappropriate.

## C. Government's Disclosure Obligation

The government states that it has not turned over the FBI 302 related to Donnell's initial law enforcement interview or "the unredacted NOPD supplemental report" because, according to the government, "those reports are protected from disclosure at this time by the *Jencks* Act."[164]  The government states that it intends to provide those documents to defendants two weeks prior to the commencement of trial.[165]  The government has also indicated, however, that it is "prepared to produce the statements should this Court order such."[166]

---

[162] R. Doc. No. 1032-1, at 17.
[163] R. Doc. No. 1077, at 16.
[164] *Id.* at 2–3.
[165] *Id.* at 10.
[166] R. Doc. No. 1077, at 12.

The *Jencks* Act, 18 U.S.C. § 3500, dictates that "no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of [subpoena], discovery, or inspection until said witness has testified on direct examination in the trial of the case." § 3500(a). However, the government does not allege that Donnell authored the reports or that they are verbatim (or near-verbatim) summaries of his testimony.

The Court's Fifth Amended Scheduling Order, which the Court issued following a joint motion of the government and defendants, states that "[m]aterials discoverable under *Brady*, to the extent they exist, will be provided immediately."[167] While there was a dispute between the parties as to the timing of *Jencks* production, the government's position (adopted in the scheduling order) was that it would provide such material (other than that which implicated witness security issues) two weeks before trial—well before production would be necessitated by the Act.[168] The government does not argue that the *Jencks* Act dictates that Brady material which is also covered by the *Jencks* Act *cannot* be disclosed prior to direct examination—and such an argument would be inconsistent with the proposed scheduling order submitted by the government.

The government has conceded that the reports contain impeachment evidence. As discussed, this evidence falls within the rule of *Brady*. The scheduling order states

---

[167] R. Doc. No. 952. *See* R. Doc. No. 949 (joint motion).
[168] *Id.*

that such material "will be provided immediately."[169]  Consequently, the government is to produce the reports in their entirety as soon as is practicable.

## VII.

For the foregoing reasons,

**IT IS ORDERED** that George, Johnson, and Ofomata's motion to exclude Robert Donnell as a witness from trial "due to the loss, destruction, and spoliation of potentially exculpatory death-case evidence" is **DENIED**.

**IT IS FURTHER ORDERED** that George, Johnson, and Ofomata's request for sanctions to be imposed on the government is **DENIED**.

**IT IS FURTHER ORDERED** that George, Johnson, and Ofomata's request for the Court to conduct an evidentiary hearing is **DENIED**.

**IT IS FURTHER ORDERED** that George, Johnson, and Ofomata's request to prohibit the government from seeking the death penalty is **DENIED**.

**IT IS FURTHER ORDERED** that the government shall provide defendants with the unredacted NOPD report and the FBI 302, no later than **WEDNESDAY, NOVEMBER 4, 2020**.  If the government is concerned that such a production will pose witness security concerns, it is to immediately request a status conference to raise the issue.

New Orleans, Louisiana, November 2, 2020

_____

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[169] *Id.*